Roger T. **CRENSHAW**, Plaintiff,

v.

**MONY LIFE INSURANCE COMPANY; Disability Management Services, Inc., Defendants.**

**Mony Life Insurance Company; Disability Management Services, Inc., Counter–Plaintiffs,**

v.

**Roger T. Crenshaw, Counter–Defendant.**

**Civil No. 02cv2108 LAB(RBB).**

United States District Court, S.D. California.

April 27, 2004.

Kristen L. Churchill, Cadena Churchill, San Diego, CA, for Plaintiff and Counter–Defendant.

Todd Matthew Sorrell, Fulbright and Jaworski, Los Angeles, CA, for Defendants and Counter–Claimant.

**ORDER CONDITIONALLY DENYING PLAINTIFF'S MOTION TO (1) DISQUALIFY PETER MASON AND TODD SORRELL AS DEFENDANT'S ATTORNEYS AND (2) DISQUALIFY OR STRIKE JEFFREY HARRIS AS DEFENDANT'S EXPERT WITNESS AND RULING ON OBJECTIONS [DOC. NOS. 119, 162, 165]**

BROOKS, United States Magistrate Judge.

On March 22, 2004, this Court heard oral arguments on Plaintiff's Motion to (1) Disqualify Peter Mason and Todd Sorrell as Defendant's Attorneys and (2) Disqualify or Strike Jeffrey Harris as Defendant's Expert Witness [Doc. No. 119]. Gordon Churchill and Raul Cadena, of Cadena Churchill, LLP, appeared on behalf of Plaintiff Roger T. Crenshaw, M.D. Peter Mason and Todd Sorrell, of Fulbright & Jaworski, appeared on behalf of Defendant MONY Life Insurance Company. At the conclusion of the hearing, the Court requested supplemental briefs addressing certain issues raised during the proceeding. On April 1, 2004, Plaintiff and Defendant each filed a supplemental brief and supplemental declarations.

A continued hearing on Plaintiff's Motion was held on April 12, 2004. Gordon Churchill and Raul Cadena, of Cadena Churchill LLP, again appeared as counsel for Crenshaw. Peter Mason, of Fulbright & Jaworski, appeared for Defendant MONY Life Insurance. The Court subsequently issued a minute order denying Plaintiff's motion and indicating that this memorandum decision would follow [Doc. No. 182].

After considering the parties' pleadings and oral arguments, Plaintiff's Motion to Disqualify is conditionally denied for the reasons outlined below.

## I. BACKGROUND

### A. Underlying Facts

In 1976, Plaintiff Roger T. Crenshaw purchased a disability insurance policy from Mutual of New York Life Insurance Company, now MONY Life Insurance. (Pl.'s Decl. Supp. Mot. at 2.) Plaintiff maintained continuous disability coverage through October of 1998. (*Id.*) At that time, Dr. Crenshaw claimed he was unable to continue practicing as a psychiatrist because of tinnitus and filed a claim for disability benefits under his policy with the Defendant. (First Am. Compl. at 3.)

Plaintiff met with Dr. Bone on September 28, 1998, to evaluate Crenshaw's worsening condition, and Dr. Bone referred him to Dr. Harris for a consultation. (Def.'s Supplemental Opp'n Sorrell Decl. (hereafter "Supplemental Sorrell Decl.") Ex. C [Depo. of Dr. Bone] at 33.) The outpatient notes of Plaintiff's examination, dated October 22, 1998, read: "Consult, referred by Dr. B[illegible]," and were signed by Dr. Byrne and cosigned by Dr. Harris. (*Id.* Ex. B.) On February 22, 1999, MONY began making payments to Crenshaw. (Answer at 3.)

In May of 2002, an adjuster employed by Defendant visited Crenshaw's home for the purpose of investigating the claim. (First Am. Compl. at 4.) Subsequently, on October 18, 2002, MONY denied Crenshaw's claim and stopped making payments. (*Id.*) This lawsuit was filed one week later. (Compl.)

On March 14, 2003, Plaintiff's initial disclosures were served; Dr. Harris was not identified as a person likely to have relevant information. (Def.'s Opp'n Sorrell Decl. (hereafter "Sorrell Decl.") Ex. A at 2.) Four days later, the Plaintiff supplemented the disclosures; again, Dr. Harris was not identified. (*Id.* Ex. B at 2.) Nevertheless, in both disclosures, Dr. Bone was named.

In its initial disclosures, Defendant MONY listed Dr. Harris as an individual likely to have discoverable information. (Supplemental Sorrel Decl. Ex. A at 23.) The parties subsequently entered into a Stipulated Protective Order, which was filed on May 15, 2003 [Doc. No. 32]. The Protective Order, however, only addressed the confidentiality of Defendant's documents and information.

All discovery in this case was to be completed by November 24, 2003, pursuant to the Court's Case Management Conference Order [Doc. No. 19]. This Motion was filed on November 26, 2003, two days after the discovery cutoff. Accompanying Plaintiff's Motion were the declarations of Plaintiff, Plaintiff's counsel, and attorney Daniel M. White. Defendant filed its Opposition, with declarations of counsel, Todd Sorrell, and Dr. Jeffrey Harris. Each side raised objections to the declarations of the other [Doc. Nos. 162, 165]. The district court referred Crenshaw's Motion to this Court for resolution on March 9, 2004 [Doc. No. 171].[1]

---

1. Plaintiff objects, on a variety of grounds, to Dr. Harris's declaration as merely referring to

## B. Contacts With Dr. Harris

### 1. Plaintiff's Contacts

Plaintiff's first and only contact with Dr. Harris occurred on October 22, 1998, when Crenshaw was referred to him for a consultative examination. (Def.'s Opp'n Harris Decl. (hereafter "Harris Decl.") at 17.) Dr. Harris examined Crenshaw and conducted several tests, including an ear exam, audiogram and blood tests. (Churchill Decl. Supp. Mot. Ex. B at B–7.) The results of the ear examination and blood tests were normal, but the audiogram displayed a rapid decline from a previous audiogram, as well as a "disturbing" drop in speech discrimination scores. (*Id.*) According to Dr. Harris, aside from the consultative examination on October 22, 1998, he has never provided any treatment or care to Crenshaw. (Harris Decl. at 17.) On November 14, 2002, Crenshaw revoked the authorization previously given to Scripps Clinic to release his confidential medical records. (Churchill Decl. Supp. Mot. Ex. A.)

### 2. Defendant's Contacts

Defense counsel indicated that Dr. Harris might be a relevant percipient witness on March 14, 2003, when Dr. Harris was named in Defendant's initial disclosures. (Sorrell Supplemental Decl. at 16.)

Defense counsel had no contact with Dr. Harris until September of 2003. At that time, Alex Medina, an associate employed by defense counsel, independently and apparently without knowledge of Dr. Harris's involvement as a potential fact witness, contacted Dr. Harris. (*Id.* at 17.) Medina was attempting to locate an expert in tinnitus. (*Id.*) Attorney Sorrell spoke by phone with Dr. Harris on October 2, 2003, and asked if he had treated the Plaintiff; Dr. Harris replied that he had not, and he "did not recall providing any consultation and treatment to Crenshaw." (*Id.*) On October 10, 2002, Sorrell traveled to San Diego and met with Dr. Harris in person; Dr. Harris reiterated his belief that he had not examined or treated Crenshaw. (*Id.*)

Sometime after that meeting, while reviewing documents, Sorrell saw the medical chart note which indicated that Dr. Harris had, in fact, met and examined Crenshaw on October 22, 1998. (*Id.*) Sorrell called the doctor on October 16, 2003, to bring the chart note to his attention. (*Id.* at 17–18.) Dr. Harris explained that a resident physician at Scripps Clinic, Dr. Byrne, was the individual who conducted the examination and wrote the note; Dr. Harris supervised the examination and co-signed the chart note. (*Id.* at 18.)

Dr. Harris completed his expert report by October 23, 2003. (*Id.*) Thereafter, on November 3, 2003, Plaintiff's counsel attempted to speak directly with him; Sorrell objected but indicated the doctor would be made available for a deposition. (Sorrell Decl. Ex. F.) On November 5, 2003, Plaintiff noticed the deposition for November 19, 2003. (Sorrell Decl. at 20–21.) Defense counsel subsequently checked with Dr. Harris and learned that

---

his expert report. (Pl.'s Objections at 1–2.) The objection that the report has not been properly authenticated is sustained; the remaining objections to the report are overruled. Nevertheless, the same expert report is attached as exhibit B to the declaration submitted by Plaintiff's counsel in support of this motion. (Churchill Decl. Supp. Mot. Ex. B.) Crenshaw also objects to statements in the declaration of Todd Sorrell as irrelevant. This objection is overruled.

Defendant MONY's objections to paragraphs 2, 5 and 7 of Churchill's declaration are overruled; its objections to paragraphs 3 and 4 are sustained. The objections to the declaration of Daniel White are sustained. Defendant's objection to Crenshaw's statement in paragraph 7 of his declaration that in November of 2002 he revoked a prior authorization to access medical information is overrule. MONY's remaining objections to the paragraph are sustained.

he was not available on the date selected by Crenshaw's counsel. (*Id.* at 21.) Sorrell then wrote to Plaintiff's counsel that the doctor was available for deposition on December 1, December 8, or December 12. (*Id.* at Ex. H.) Although Plaintiff made numerous attempts to schedule a deposition prior to the November 24th discovery cutoff, MONY did not produce Dr. Harris prior to that date. (Pl.'s Mem. at 10; Def.'s Opp'n at 12–14.) Despite MONY's offers to produce Dr. Harris for deposition shortly after the cutoff, Crenshaw rejected those offers. On November 26, 2003, Plaintiff filed this motion.

## II. DISCUSSION

### A. Disqualification of Counsel

 The disqualification of counsel because of an ethical violation is a discretionary exercise of the trial court's inherent powers. *See United States v. Wunsch,* 84 F.3d 1110, 1114 (9th Cir.1996); *see also Visa U.S.A., Inc. v. First Data Corp.,* 241 F.Supp.2d 1100, 1103–04 (N.D.Cal.2003). However, disqualification is a drastic measure that is disfavored. *Visa U.S.A., Inc. v. First Data Corp.,* 241 F.Supp.2d at 1104. Because they are often tactically motivated, motions to disqualify "should be subjected to particular judicial scrutiny." *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.,* 760 F.2d 1045, 1050 (9th Cir.1985)(internal citations omitted). Even a violation of the California Rules of Professional Conduct does not automatically compel disqualification. *Gregori v. Bank of America,* 207 Cal.App.3d 291, 303, 254 Cal.Rptr. 853, 860 (Cal.Ct.App.1989.) The court's decision on a motion to disqualify is reviewed for an abuse of discretion. *See Gas–A–Tron of Ariz. v. Union Oil Co.,* 534 F.2d 1322, 1325 (9th Cir.1976).

When deciding whether disqualification of counsel is appropriate, some courts consider whether the attorney's conduct would taint the trial or legal proceedings in a way that would deprive the parties of a fair trial. *See FDIC v. Isham,* 782 F.Supp. 524, 528 (D.Colo.1992). "[T]he paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *State Farm Mut. Auto. Ins. Co. v. Federal Ins.,* 72 Cal.App.4th 1422, 1428, 86 Cal. Rptr.2d 20, 24 (Cal.Ct.App.1999).

Other courts, when considering whether to disqualify an attorney for improper ex parte communications, have weighed the balance among "(1) the client's interest in being represented by counsel of its choice; (2) the opposing party's interest in a trial free from prejudice due to disclosure of confidential information; and (3) the public's interest in the scrupulous administration of justice." *Faison v. Thornton,* 863 F.Supp. 1204, 1216 (D.Nev.1993) (citing *Meat Price Investigators Ass'n v. Spencer Foods,* 572 F.2d 163, 165 (8th Cir.1978)); *see also Complaint of Korea Shipping Corp.,* 621 F.Supp. 164 (D.Alaska 1985).

Recently, in *Snider v. Superior Court,* 113 Cal.App.4th 1187, 1197–98, 7 Cal. Rptr.3d 119, 125 (Cal.Ct.App.2003), the court explained that it was important to have a bright-line test to determine the ethical boundaries of an attorney's conduct. "[O]therwise, an attorney would be uncertain whether the rules had been violated until ... he or she is disqualified. Unclear rules risk blunting an advocate's zealous representation of a client." *Id.* (quoting *Nalian Truck Lines, Inc. v. Nakano Warehouse & Transp. Corp.,* 6 Cal. App.4th 1256, 1264, 8 Cal.Rptr.2d 467, 472 (1992)). This case illustrates that what is perceived to be a bright-line test may, nonetheless, be difficult to apply.

### B. Ethical Constraints

Plaintiff contends that this Court's local rules and an attorney's ethical obligations were violated by defense counsel's ex parte

contacts with Dr. Harris. (Pl.'s Mem. at 7.) Local rules provide that "any attorney permitted to practice in this court shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California. . . ." S.D. Cal. Civ. L.R. 83.4.

Crenshaw's argument rests primarily on opinions issued by the California Bar Association Committee on Legal Ethics, the San Diego Bar Association Committee on Legal Ethics, and ABA Ethics Code 7–38. Both committee opinions suggest that a defense attorney should not contact a plaintiff's treating physician without giving prior notice to plaintiff's counsel. (Pl.'s Mem. at 4–6, citing Cal. Bar Ass'n Comm. on Legal Ethics Op.1975–33, San Diego Bar Ass'n Comm. on Legal Ethics Op.1983–9, ABA Ethics Code 7–38.)

The California Bar Association committee opinion states, in part:

> [A] communication by defense counsel with plaintiff's *treating physician,* without prior consent of plaintiff's counsel, regarding information in respect to which the physician/patient privilege has been waived, does not constitute a violation of a rule; however, because of the possibility of eliciting information not within the waiver, defense counsel's ethical duty requires that prior notice be given to plaintiff's counsel.

Cal. Bar Assoc. Comm. on Legal Ethics Op.1975–33 (emphasis added). The opinion imposes a prior notice requirement but expressly states that the communication does not violate any rule of professional conduct. In 1983, the San Diego Bar Association issued an opinion on the same subject and similarly disapproved of ex parte contacts with a plaintiff's treating physician. S.D. Bar. Assoc. Comm. on Legal Ethics Op.1983–9. That opinion concludes: "On balance, the burden of prior notification is not so restrictive as to warrant its rejection. The Committee is

motivated by the desire to maintain consistency between opinions of the State Bar Ethics Committee and this Committee." *Id.* Although Crenshaw acknowledges that defense counsel was not barred from communicating ex parte with Dr. Harris, Plaintiff contends that defense counsel were obligated to give *notice* to Plaintiff's counsel before doing so. (Pl.'s Mem. at 6–7.)

Plaintiff also relies on rule 3–210 of the California Rules of Professional Conduct which states, in part: "A member shall not advise the violation of any law . . . unless the member believes in good faith that such law, rule, or ruling is invalid." Cal. R. of Prof'l Conduct 3–210. There is nothing in the record which suggests that defense counsel advised Dr. Harris not to comply with provisions of California law or the Health Insurance Portability and Accountability Act. Rule 3–210 gives Crenshaw with no basis for relief. Consequently, the Court will address whether defense counsel's ex parte contacts with Dr. Harris constitute sanctionable conduct.

### 1. Was Dr. Harris a Treating Physician?

■ The opinions relied upon by Plaintiff to disqualify MONY's attorneys presuppose that Dr. Harris is a "treating physician." If so, defense counsel breached an ethical obligation to give prior notice before contacting the doctor. MONY, however, disputes Plaintiff's contention that the doctor is or was a treating physician. (Def.'s Mem. at 6.)

Dr. Harris does not consider himself Dr. Crenshaw's treating physician. In his declaration, attached to Defendant's Opposition, the doctor states: "I met and examined Crenshaw on October 22, 1998, on a referral from Dr. Robert Bone at Scripps Clinic. . . . Apart from that one single visit . . . I have never provided any treatment,

consultation, or care to Crenshaw and *I am not his treating physician.*" (Harris Decl. at 17 (emphasis added).) In addition, Dr. Harris has indicated that the October 22nd examination was performed by a resident, Dr. Byrne, under Dr. Harris's supervision. (Supplemental Sorrell Decl. at 17–18.) Dr. Byrne wrote the outpatient progress note, dated October 22, 1998, and Dr. Harris cosigned the note as Dr. Byrne's supervisor.[2] (*Id.*)

Crenshaw takes the contrary position. He states: "During my session with Dr. Harris, I disclosed to him what I believed was confidential and privileged information. I had no reason to believe that Dr. Harris was acting as anything other than *my treating physician.*" (Crenshaw Decl. at 2 (emphasis added).) In spite of this statement, there is evidence that Dr. Crenshaw did not previously regard Dr. Harris as his treating physician or as a significant member of his treating team.

Crenshaw was deposed in a separate matter in August of 2000. (Sorrell Decl. at 19.) Although less than two years had passed since his meeting with Drs. Byrne and Harris, when asked to identify each doctor he saw for tinnitus or other conditions, Crenshaw failed to name either Dr. Byrne or Dr. Harris. (*Id.* at 19–20.) In his initial disclosures, served on March 14, 2003, and supplemental initial disclosures, served on March 18, 2003, Dr. Crenshaw did not identify Dr. Harris as an individual likely to have discoverable information that Plaintiff might use to support his claims or defenses. (*See* Sorrell Decl. Ex. A at 2.) In Plaintiff's May 9, 2003, response to an interrogatory seeking the names of all healthcare providers since

1990, Dr. Harris was not identified. (Sorrell Decl. Ex. C at 3.)

There is also third-party evidence that Dr. Harris was not Dr. Crenshaw's treating physician. In deposition testimony, Dr. Bone described a notation "Plan, Dr. Harris and return to me." (Supplemental Sorrell Decl. Ex. C at 31–33.) Dr. Bone testified:

Well, the plan was for him to see Dr. Harris and see if he had any other thoughts about this problem, because it seemed to be such a weighty issue for Dr. Crenshaw that I wanted to be sure that I was covering everything that needed to be done and I hadn't missed anything, and it was the nature of the *second opinion* that we were asking for.

(*Id.* at 33 (emphasis added).) The outpatient progress notes for Crenshaw contain the following: "Consult referred by Dr. B[illegible]." (Supplemental Sorrell Decl. Ex. B.)

Citing primarily to Social Security and California Workers Compensation Regulations, Defendant argues that Dr. Harris is, at best, a non-treating examining physician. (Def.'s Opp'n at 6, citing 20 C.F.R. § 404.1502.) "Treating physician" has been used to "differentiate the physician overseeing a patient's long-term care from a doctor brought in merely to take a snapshot of a patient's health at a point in time." *Lamoreaux v. Medtronic, Inc.,* 2001 WL 34563931, *4 (W.D.Mich. 2001) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F.Supp.2d 205 (D.Conn.1998) (granting disability benefits under ERISA plan)).

Historically, doctors who saw patients once were not considered treating physicians. *McSwain v. Bowen,* 814 F.2d 617,

---

**2.** These facts raise the question posed by at least one other court—"whether patients at clinics and teaching hospitals, in practice, have treating physicians." *Day v. Shalala,* 23 F.3d 1052, 1067 (6th Cir.1994). This Court,

like the Sixth Circuit in *Day,* need not address this issue because the record is sufficient to rule on Plaintiff's Motion without deciding the question.

619 (11th Cir.1987). Courts which addressed this question have consistently held that a treating physician is one who maintains an ongoing treating relationship with a patient, as opposed to a consulting physician who has only seen the patient on one occasion. *See Day v. Shalala,* 23 F.3d at 1067 n. 18. The California Code of Regulations, title 8, section 9785(a), similarly defines primary treating physician (for Workers' Compensation purposes) as: "The physician who is primarily responsible for managing the care of an injured employee, and who has examined the employee at least once for the purpose of rendering or prescribing treatment and who has monitored the effect of the treatment thereafter."

Current Social Security regulations define a treating source as a physician who provides medical treatment or evaluation and has an "ongoing treatment relationship" with the patient. 20 C.F.R. § 404.1502 (2004). An ongoing treatment relationship consists of a "frequency consistent with medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.*

The Ninth Circuit recently held that a physician who examines a patient once may be considered a treating physician if that doctor *continues to monitor and oversee the patient's care. See Benton v. Barnhart,* 331 F.3d 1030, 1035 (9th Cir. 2003) (emphasis added) (noting that the psychiatrist who saw Benton once continued to manage her care). Dr. Harris did not do so. The *Benton* court stated: "A psychiatrist may therefore manage the provision of psychiatric medication, receiving reports from the medical sources providing 'hands-on' treatment, without seeing the patient with any regularity. This was precisely Dr. Zwiefach's role in Benton's treatment." *Id.*

Finally, in *Torres v. Superior Court,* the physician had no contact with the patient but reviewed the results of medical tests performed on him and prepared a report on the patient's condition six years before the surgery which gave rise to a malpractice lawsuit. 221 Cal.App.3d 181, 183, 270 Cal.Rptr. 401, 402 (Cal.Ct.App.1990). The court of appeal held that the doctor could be retained as an expert witness to give testimony for the defendant. *Id.* at 187, 270 Cal.Rptr. at 404–05. The *Torres* court noted that in the lower court, the petitioner had argued unsuccessfully that the doctor was a treating physician and could not be called as an expert witness by the opposing party. *Id.* at 183, 270 Cal.Rptr. at 402.

Disqualification motions turn on their facts. In an analogous case, the court examined whether a former employee's counsel violated the employer's attorney-client privilege and rule 2–100(B)(1) of the California Rules of Professional Conduct (prohibiting an attorney from communicating with an officer, director, or managing agent of a corporation represented by counsel about the subject of the representation without the consent of the other lawyer). *Snider v. Superior Court,* 113 Cal.App.4th at 1209, 7 Cal.Rptr.3d at 134. The court addressed whether counsel for an employee sued by his former employer violated rule 2–100(B)(1) by conducting an ex parte interview with a sales manager and a production department supervisor who worked for the employer. *Id.* Because there was no evidence that the two interviewed employees were managing agents, there was no violation of the Code of Professional Conduct, and the lower court erred in disqualifying counsel.

The facts of this case, case law, and federal and state regulations that have considered who is a treating doctor lead to the conclusion that Dr. Harris was not Plaintiff's treating physician. As a result, defense counsel did not violate any ethical

duty to give Crenshaw's counsel notice before contacting Dr. Harris.

## C. The Effect of California Law

Plaintiff and Defendant both agree that because this is a diversity case governed by California law, the Court must also look to state law to decide claims of privilege. (Pl.'s Supplemental Brief at 10–11; Def.'s Supplemental Brief at 9–10.) *See In re California Pub. Utils. Comm'n,* 892 F.2d 778, 781 (9th Cir.1989). Consequently, the Court will consider whether counsel's conduct breached California privilege law and constitutes a separate basis for disqualification.

In *Torres v. Superior Court,* the court of appeal wrote: "Once the patient waives his right to confidentiality by putting his physical condition in issue by filing suit, any disclosure pertinent to the issues in litigation within the scope of section 996 [of the Evidence Code] is permitted." 221 Cal. App.3d at 185, 270 Cal.Rptr. at 403. Section 996 of the California Evidence Code states: "There is no privilege under this article as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by: (a) The patient. . . ." Cal. Evid.Code § 996 (West 1995). Defendant correctly observes that Dr. Crenshaw has tendered his hearing condition and tinnitus by bringing suit. He contends that he is totally disabled because of these ailments and is entitled to compensation under his policy of disability insurance. (*See* First Am. Compl. at 3; Crenshaw Decl. at 2–3.)

■ Once a plaintiff has waived the confidentiality of the physician-patient privilege by placing his medical condition at issue, there is no restraint on the physician giving opinion testimony on behalf of the defense. *Torres v. Superior Court,* 221 Cal.App.3d at 185, 270 Cal.Rptr. at 403. *Torres* reached this conclusion after balancing the duty owed by a physician to his

patient against the need for truth. The court reviewed relevant portions of state statutes authorizing expert witness fees and stated that they "do not limit a physician asked for his or her expert opinion to giving testimony favorable only to the patient/claimant." *Id.* at 187, 270 Cal.Rptr. at 405.

Recently, in *Scripps Clinic v. Superior Court,* 108 Cal.App.4th 917, 941, 134 Cal. Rptr.2d 101, 117 (Cal.Ct.App.2003), the court reaffirmed that "in a patient's malpractice action, his physician could testify as an expert for the defense." Other courts agree. *See Carson v. Fine,* 123 Wash.2d 206, 213–14, 867 P.2d 610, 615 (1994) (noting that it and other authorities find that once a plaintiff voluntarily places his or her physical condition in issue in a judicial proceeding, the physician-patient privilege is waived with respect to that condition); *Tucker v. John R. Steele & Assoc.,* 1994 WL 127246, *6 n. 4, 1994 U.S. Dist. LEXIS 4600, at *12 n. 4 (N.D.Ill. Apr. 12, 1994) ("Although state courts are divided over the issue of whether or not the adverse opinions of a treating physician should be excluded to preserve the fiduciary nature of the physician-patient relationship, the better argument appears to be that such evidence should be admitted.")

Where filing suit has resulted in a waiver of the physician-patient privilege, some courts prohibit *future* ex parte contacts with a physician for fear that privileged communications, not subject to the waiver, might be disclosed. *See Torres v. Superior Court,* 221 Cal.App.3d at 188, 270 Cal. Rptr. at 405; *Neubeck v. Lundquist,* 186 F.R.D. 249, 251 (D.Me.1999) (holding that under Maine law, defense counsel's past ex parte contact with decedent's treating physician was not sanctionable but future contacts were to be through formal discovery or after notification to and approval by

plaintiff); *see also Benally v. United States,* 216 F.R.D. 478, 480–81 (D.Ariz. 2003) (applying Arizona law and declining to authorize ex parte interview of plaintiff's treating physician before her deposition).

In another California case, the court applied *Torres* and held that defense counsel should avoid further ex parte communications with the physician until formal discovery was completed. *Province v. Center for Women's Health and Family Birth,* 20 Cal.App.4th 1673, 1685, 25 Cal.Rptr.2d 667, 674 (Cal.Ct.App.1993). However, in that case, the need for prophylactic discovery to guard against excessive physician disclosures is doubtful. In *Province,* the plaintiff suffered severe brain damage at birth. On the date she was born, Dr. Karanjawala examined the placenta and umbilical cord and prepared a pathology report. *Id.* at 1681, 25 Cal.Rptr.2d at 671. The case was tried twice, and the doctor testified at both trials, although he had not been designated as an expert witness or deposed. *Id.* at 1681–83, 25 Cal.Rptr.2d at 672–73. The court of appeal held that before retrial, the doctor must be deposed if he was going to give expert testimony. *Id.* at 1684, 25 Cal.Rptr.2d at 673.

> Here, although we know the claim [plaintiff] makes we do not know what further evidence might be proffered by Doctor Karanjawala. Such information awaits discovery. Although Doctor Karanhawala's expression of his opinions concerning [plaintiff's] condition to date do not appear to violate the physician-patient privilege, the admonition by the Court of Appeal in *Torres* for counsel to avoid ex parte communications with physicians before discovery is completed should be heeded by counsel here.

*Id.* at 1685, 25 Cal.Rptr.2d at 674.

Like *Torres,* the *Province* court did not suggest that disqualification or any other sanction would be appropriate because of defense counsel's prior communications with the doctor. Nevertheless, *Torres* found that petitioner's right to ensure that his physician-patient privilege is not compromised in an ex parte setting required that defense counsel's future communications be limited to formal discovery procedures. Pretrial communications with the physician were restricted until it could be shown that ex parte communication would not impinge on Torres's physician-patient privilege. *Torres,* 221 Cal.App.3rd at 188, 270 Cal.Rptr. at 405.

The party seeking the disqualification "bears the burden of proving confidentiality and non-waiver." *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F.Supp. 1498, 1501–02 (D.Colo.1993). The evidence in this case leads far down the road to establishing that defense counsel's ex parte contacts with Dr. Harris did not impinge on Crenshaw's privilege. The outpatient notes, expert report, Declaration of Dr. Harris and Declaration of Dr. Crenshaw show that defense counsel's contacts with Dr. Harris involved the medical condition which is the subject of this litigation. Crenshaw's physician-patient privilege has been waived for communications relating to his hearing condition, tinnitus and whether he is disabled from his occupation as a result of the medical conditions.

■ Crenshaw entered into a confidential physician-patient relationship by submitting to a consultative examination with Dr. Harris. However, Plaintiff did not disclose any information to Dr. Harris that is not subject to waiver, nor has Crenshaw demonstrated a risk of disclosure of other information which remains confidential. California law does not alter the conclusion that under the facts of this case, the motion to disqualify should be denied. Nevertheless, to ensure that no improper disclosures have been made, defense counsel is to refrain from further ex parte contacts

with Dr. Harris until he has been made available for a deposition, consistent with *Torres.* If disclosures beyond the subject matter of this suit and Dr. Crenshaw's corresponding waiver have been made, Plaintiff is not precluded from returning to the Court.

### D. Disqualification of Expert Witnesses

■ "Courts have inherent power to disqualify experts." *Stencel v. Fairchild Corp.,* 174 F.Supp.2d 1080, 1082 (C.D.Cal. 2001). However, expert witnesses stand in shoes different from those of counsel. "An expert does not advocate during litigation but acts as a source of information and opinion." *United States v. Salamanca,* 244 F.Supp.2d 1023, 1024 (D.S.D.2003). Consequently, the standard for disqualifying an expert differs from the standard for disqualifying counsel. *City of Springfield v. Rexnord Corp.,* 111 F.Supp.2d 71, 74 n. 2 (D.Mass.2000) (cataloging cases); *see also Shadow Traffic Network v. Superior Court,* 24 Cal.App.4th 1067, 1080, 29 Cal. Rptr.2d 693, 699–700 (Cal.Ct.App.1994). However, there is authority for applying the same test. *Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588, 591 (D.Minn.1986).

■ The disqualification of an expert witness can arise when an expert switches sides to consult for the opposing party or is affiliated with experts for the opposing party. *City of Springfield v. Rexnord Corp.,* 111 F.Supp.2d at 74–76. Technically, Dr. Harris is not an expert who has switched sides, although he participated in Plaintiff's 1998 examination. Arguably, the doctor was one of Plaintiff's physicians who has changed sides to become an expert for the Defendant. In switching-sides cases, disqualification may be appropriate if the expert has confidential information received from the original hiring party. *Erickson v. Newmar Corp.,* 87 F.3d 298,

300–01 (9th Cir.1996) (citing *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F.Supp. at 1505). Disqualification is ordered to protect confidential communications, often attorney work product.

Dr. Harris may have been affiliated with Dr. Bone, who is one of Plaintiff's listed witnesses. (Supplemental Sorrell Decl. Ex. C at 31; Ex. D at 37.) However, Crenshaw does not seek to disqualify Dr. Harris on this basis. Instead, Plaintiff argues "Dr. Harris is a fact witness and MONY, by designating him as an expert witness, has blocked Dr. Crenshaw and his counsel from contacting Dr. Harris." (Pl.'s Mem. at 2.) Alternatively, Crenshaw argues that disqualification is appropriate because Dr. Harris did not appear for a properly noticed deposition before the discovery cutoff date. (*Id.*) These arguments are not persuasive and do not entitle Plaintiff to relief.

■ Whether to disqualify an expert witness can also arise if the moving party can demonstrate that he or she had an objectively reasonable belief that a confidential relationship existed with the expert, and during the course of that relationship, confidential information was disclosed. *Koch Refining Co. v. Jennifer L. Boudreaux MV,* 85 F.3d 1178, 1181 (5th Cir.1996). Many courts also consider the public interest in permitting or prohibiting testimony from the expert. *Id.; see also English Feedlot, Inc. v. Norden Labs. Inc.,* 833 F.Supp. at 1501. In reaching its decision, the Court weighs competing considerations. It balances the integrity of the judicial process, avoidance of conflicts of interest, ensuring access to expert witnesses with specialized knowledge, and allowing experts to "pursue their professional calling" *English Feedlot, Inc.,* 833 F.Supp. at 1504–05.

■ The party seeking disqualification bears the burden of proving confidentiality

and nonwaiver. *Id.* at 1501–02. Defendant does not dispute that Crenshaw entered into a confidential physician-patient relationship by submitting to a consultative examination with Dr. Harris. However, Crenshaw must show that he disclosed confidential information to Dr. Harris that is not subject to waiver or that there is a risk of disclosing information that remains confidential. Plaintiff does not attempt to demonstrate either.

■ By filing this suit, Dr. Crenshaw waived the physician-patient privilege concerning whether his tinnitus and hearing condition render him disabled. *See Galarza v. United States,* 179 F.R.D. 291, 294 n. 3 (S.D.Cal.1998). Plaintiff does not argue otherwise. Based upon the record before the Court, especially the limited nature of the consultation with Dr. Harris and Plaintiff's one contact with Dr. Harris and the examining resident physician, Dr. Byrne, defense counsel's communications with Dr. Harris did not exceed Crenshaw's waiver of his physician-patient privilege. The motion to disqualify Dr. Harris from acting as an expert witness for Defendant is denied.

Nevertheless, ex parte contacts with a healthcare provider are fraught with danger. If Crenshaw's contacts with Dr. Harris were ongoing or the doctor continued to monitor Crenshaw's condition, the Court's conclusion might be different. Likewise, if Crenshaw consulted with Dr. Harris regarding health issues beyond those which are the subject matter of this case, the conclusion might be different. When initiating an ex parte contact with an adversary party's physician, counsel does not know where the contact will lead and what information will be disclosed.

Until the scope of a litigant's waiver and the extent of his or her relationship with a physician are clear, the better course is for counsel for the adversary to limit contact with a healthcare provider to formal discovery. *Neubeck v. Lundquist,* 186 F.R.D.

at 250. This protects the lawyer and physician. The doctor is not responsible for deciding what information is no longer privileged and whether any information remains privileged. *Id.* The lawyer also avoids the risk of violating ethical rules, the party's physician-patient privilege and the Health Insurance Portability and Accountability Act of 1996 (HIPAA). *Cf. Snider v. Superior Court,* 113 Cal.App.4th at 1193–94, 7 Cal.Rptr.3d at 122 (outlining cautionary steps counsel should take prior to contacting employees of adverse party).

**E. The Health Insurance Portability and Accountability Act**

Plaintiff also contends that the Health Insurance Portability and Accountability Act of 1996 (HIPAA) was violated by Dr. Harris, and counsel's failure to give notice of his ex parte contacts with the doctor assisted the doctor in committing a violation. (Pl.'s Mem. at 8.) Crenshaw cites ABA Model Rules of Professional Conduct and contends that assisting in the violation of law is a separate breach of ethical rules. (*Id.*) Even if the ABA rules are applied, "the violation of a model rule would not compel disqualification as a matter of law." *Hetos Investments, Ltd. v. Kurtin,* 110 Cal.App.4th 36, 46–47, 1 Cal.Rptr.3d 472, 479 (Cal.Ct.App.2003). Nevertheless, Plaintiff's motion raises the question of whether counsel, rather than merely assist in violating HIPAA, violated its provisions.

HIPAA altered the manner in which physicians are permitted to disclose individual medical information. 42 U.S.C.A. §§ 1320d, *et seq.* (West 2003). "HIPAA and the standards promulgated by the Secretary of Health and Human Services ('Secretary') in the Code of Federal Regulations set forth the baseline for the release of health information." *Law v. Zuckerman,* 307 F.Supp.2d 705, 708 (D.Md.2004). HIPAA regulations were ef-

fective on April 14, 2001, but full compliance with them was not required until April 14, 2003. *United States ex rel. Stewart v. La. Clinic,* 2002 WL 31819130, *3, 2002 U.S. Dist. LEXIS 24062, at *10 (E.D.La. Dec. 12, 2002).

During the course of litigation, HIPAA authorizes several options for obtaining medical records from healthcare professionals, including court orders, subpoenas, or formal discovery requests pursuant to adequate protective order. *See Hutton v. City of Martinez,* 219 F.R.D. 164, 167 (N.D.Cal.2003); 45 C.F.R. § 164.512(e)(2003). "HIPAA clearly regulates the methods by which a physician may release a patient's health information, including 'oral' medical records." *Law v. Zuckerman,* 307 F.Supp.2d at 708.

As discussed in the preceding section, if there is *no risk* of disclosing a patient's confidential information, because confidentiality has been waived by initiating suit or otherwise, California law does not prohibit an attorney's ex parte contacts with a nontreating physician. This principle, however, appears to conflict with the purposes and procedures of HIPAA.

### 1. HIPAA in Diversity Cases

 Rule 501 of the Federal Rules of Evidence states that in civil cases where state law supplies the rule of decision, "the privilege of a ... person ... shall be determined in accordance with state law." Fed.R.Evid. 501. However, to the extent there is a difference between procedure under California law and under HIPAA, the Court must decide which applies. The Supreme Court set the difficult-to-apply standard for answering this question. A federal practice will be enforced by a district court over a contrary state practice if the state procedure is "not a rule intended to be bound up with the definition of the rights and obligations of the parties...." *Byrd v. Blue Ridge Rural Elec. Coop.,*

*Inc.,* 356 U.S. 525, 536, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). The Court balances the federal interest against the state's interest.

HIPAA's stated purpose of protecting a patient's right to the confidentiality of his or her individual medical information is a compelling federal interest. California similarly recognizes a person's interest in protecting private medical information. *See Dep't of Motor Vehicles v. Superior Court,* 100 Cal.App.4th 363, 373, 122 Cal. Rptr.2d 504, 511 (Cal.Ct.App.2002). There is a less compelling state interest in permitting access to medical information where confidentiality has been waived.

HIPAA recognizes the potential for federal and state differences. In *Law v. Zuckerman,* a medical malpractice case, the court held that HIPAA and related regulations supercede any contrary state law unless the state law "relates to the privacy of individually identifiable health information and is 'more stringent' than HIPAA's requirements." 307 F.Supp.2d at 710 (citing 42 U.S.C. § 1320d–7(a)(2)(B) and 45 C.F.R. § 160.203.); *see also United States ex rel. Stewart v. La. Clinic,* 2002 WL 31819130, *3, 2002 U.S. Dist. LEXIS, at *9. Otherwise, the provisions of HIPAA must be applied.

In *Nat'l Abortion Fed'n v. Ashcroft,* 2004 WL 555701, **5–6, 2004 U.S. Dist. LEXIS 4530, at **17–18 (S.D.N.Y. Mar. 19, 2004), a case arising under federal law, the court measured the requirements of HIPAA against the federal law of privileges and the Federal Rules of Evidence. It found that HIPAA and its regulations, not rule 501 of the Federal Rules of Evidence, controlled the enforceability of subpoenas. *Id.* at 2004 WL 555701, **5–6, 2004 U.S. Dist. LEXIS 4530, **19–20. The conflict is more pronounced when state law does not mirror the provisions of HIPAA.

The *Byrd* analysis requires the Court to balance California's interest in having federal courts recognize its rules and policies, the federal courts' interest in enforcing federal principles and the litigants' interest in a uniform outcome, regardless of forum. 17A James Wm. Moore, et al., *Moore's Federal Practice* § 124.06[2], at 124–39 (3d ed.2003). The balance in this case requires the Court to apply the disclosure procedures of HIPAA.

HIPAA's privacy provisions allow for disclosure of medical information in the course of administrative or judicial proceedings; however, the Act places certain requirements on both the medical professional providing the information and the party seeking it. *See* 45 C.F.R. § 164.512(e) (2004); *see also Hutton*, 219 F.R.D. at 167. Under HIPAA, disclosure is permitted, *inter alia*, pursuant to a court order, subpoena, or discovery request when the healthcare provider "receives satisfactory assurance from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order. . . ." 45 C.F.R. § 164.512(1)(e)(ii)(b). The protective order must prohibit "using or disclosing the protected health information for any purpose other than the litigation . . ." and "[r]equire[ ] the return to the [physician] or destruction of the protected health information . . . at the end of the litigation or proceeding." 45 C.F.R. § 164.512(1)(e)(v).

Although the parties in this case entered into a protective order, it only protects confidential information of *Defendant* [Doc. No. 32]. (Stipulated Protective Order, dated May 13, 2003, at 1.) Because there is no language in the Order, or anywhere else, which provides similar protection to Crenshaw, the Protective Order does not satisfy the requirements of HIPAA. *See* 45 C.F.R. § 164.512(e)(ii)(v). Defense counsel's ex parte communication with Dr. Harris does not fall within HIPAA's requirement that confidential medical information be disclosed pursuant to a court order, subpoena, or discovery request. 45 C.F.R. § 160.103 (2004); 45 C.F.R. § 164.512(e)(1)(i) and (e)(1)(ii)(A) and (B).

Defendant argues that informal discovery techniques such as the methods employed by defense counsel are not prohibited by California law. (Def.'s Opp'n at 12.) However, HIPAA does not authorize ex parte contacts with healthcare providers. In this case, where no protective order safeguarding Crenshaw's privacy is in place, HIPAA's disclosure procedures apply. Only formal discovery requests appear to satisfy the requirements of § 164.512(e). As a result, defense counsel's pretrial contacts with Dr. Harris and the doctor's disclosures were in violation of HIPAA.

## F. Appropriate Sanctions

The Court has concluded that defense counsel's conduct does not constitute sanctionable conduct under applicable ethical rules or California law. But MONY's attorneys and Dr. Harris failed to follow the provisions of HIPAA; therefore, the Court must determine whether the imposition of sanctions is appropriate. Crenshaw seeks to disqualify counsel and Dr. Harris. As discussed above, disqualification is a disfavored sanction. *Visa U.S.A., Inc. v. First Data Corp.*, 241 F.Supp.2d at 1104. It is a drastic penalty which courts should hesitate to impose. *Id.* In some circumstances, the severe sanction may be warranted; this is not one of them.

Congress has stated its view of the appropriate penalty for a HIPAA violation. Section 1320d–5 of the statute states: "Except as provided in subsection (b) of this section, the Secretary shall impose on any person who violates a provision of this part

a penalty of not more than $100 for each such violation...." 42 U.S.C.A. § 1320d–5(a)(1)(West 2003).

The Act does not address how to treat a HIPAA violation that occurs during discovery or trial. At least one court has looked to rule 37 of the Federal Rules of Civil Procedure to determine what sanction would be appropriate. *See Law v. Zuckerman,* 307 F.Supp.2d at 712 (noting that the $100.00 penalty that could be imposed was "mild" and a statutory defense may be available, so no sanction was imposed). Another court, in a pre-HIPAA case, construed *Arkansas law* to prohibit "non-consensual" ex parte conversations with treating physicians. *Harlan v. Lewis,* 982 F.2d 1255, 1257 (8th Cir.1993). In *Harlan,* defense counsel had designated the plaintiff's doctors to be "defense experts." *Id.* at 1258. The district court imposed fines of $2,500 for each of two ex parte contacts between defense counsel and plaintiff's physicians and prohibited future ex parte meetings with the physicians. *Id.* at 1257–58.

The evidence before the Court establishes that attorney Alex Medina identified Dr. Harris as an expert knowledgeable in the field of tinnitus. (Supplemental Sorrell Decl. at 17.) As a result, on October 2 and 10, 2003, attorney Sorrell spoke and met with Dr. Harris. (*Id.*) On both occasions, the doctor stated that he did not recall Crenshaw. (*Id.*) After Sorrell discovered the outpatient note with Dr. Harris's signature and called Dr. Harris, the doctor recalled his consultation with Crenshaw. (*Id.* at 17–18.) Even so, Sorrell had notice that Dr. Harris was a healthcare provider for Crenshaw; Sorrell listed Harris on Defendant's initial disclosures. (*Id.* Ex. A at 23.)

The circumstances do not excuse the HIPAA violation, but they go to the severity of the appropriate sanction. The Court will fashion a remedy that addresses the HIPAA violation and ensures that defense counsel has not exceeded the scope of Plaintiff's waiver of his physician-patient privilege, resulting from bringing this suit. A sanction short of disqualification is appropriate.

Consistent with this Court's Minute Order, dated April 16, 2004, the Defendant is to produce Dr. Harris for deposition at its expense. MONY is responsible for (1) the expert witness fee charged by Dr. Harris for his deposition, (2) court reporter fees, and (3) attorney's fees incurred by Crenshaw for taking the deposition. Absent good cause and a further order of the Court, the deposition is not to exceed three hours. In addition, defense counsel is not to have any further ex parte communications with Dr. Harris prior to the deposition, unless Plaintiff chooses to forego the deposition.

## III. CONCLUSION

Crenshaw has failed to prove an ethical violation. Counsel's conduct does not warrant disqualification under California law. Nevertheless, Plaintiff has shown that Defendant violated HIPAA by contacting Dr. Harris ex parte in the absence of a qualified protective order and without a formal discovery request. The relief sought by Plaintiff is extreme and not warranted in this case. Lesser sanctions than those requested by Crenshaw are appropriate. Plaintiff's Motion to Disqualify Peter Mason and Todd Sorrell as Defendant's Attorneys is **DENIED** on the condition that Dr. Harris be made available for deposition as outlined above.

Plaintiff has also moved to disqualify or strike Dr. Harris as an expert witness for Defendant. Plaintiff has failed to establish that Dr. Harris should be precluded from serving as Defendant's expert witness. Under the circumstances of this case, the Court concludes that imposing a separate

sanction on Dr. Harris for violating the provisions of HIPAA is unwarranted. Although MONY failed to produce the doctor for deposition prior to the discovery cutoff date, Defendant had no objection to the taking of the deposition after the discovery deadline. A stipulation to that effect would have gone far towards minimizing or eliminating the need for this motion. Plaintiff has again sought the maximum penalty for a correctable failure. Plaintiff's Motion to Disqualify or Strike Jeffrey Harris as Defendant's Expert Witness is **DENIED.**