Ella G. Alexander WADE, Plaintiff,

v.

Felice A. VABNICK–WENER, M.D., Defendant.

No. 2:09–cv–2275–V.

United States District Court, W.D. Tennessee, Western Division.

July 2, 2010.

Wendell L. Hoskins, II, Scot C. Allen, Law Office of Wendell L. Hoskins II, Caruthersville, MO, for Plaintiff.

Katherine L. Frazier, William D. Domico, Domico Kyle, PLLC, Memphis, TN, for Defendant.

ORDER GRANTING MOTIONS FOR PROTECTIVE ORDERS TO REPRESENT JEFFREY WILLIAMS, M.D., AND ANANT SHAH, M.D.

DIANE K. VESCOVO, United States Magistrate Judge.

Before the court are two motions filed by the defendant, Felice A. Vabnick–Wener, M.D., ("Dr. Vabnick"), seeking a limited protective order to allow Dr. Vabnick's attorneys, Domico Kyle, PLLC, to represent Dr. Jeffrey Williams and Dr. Anant Shah, nonparty physicians, for depositions and in anticipation of their testimony by deposition or at trial. The plaintiff, Ella G. Alexander Wade, filed responses in opposition to both motions. For the reasons that follow, the motions are granted.

## I. PROCEDURAL AND FACTUAL BACKGROUND

In this wrongful death lawsuit, Wade claims Dr. Vabnick–Wener committed medical malpractice during heart surgery on her husband, Arlie Alexander, resulting in his death on November 12, 2002. On that day, Alexander was scheduled to undergo his third coronary artery bypass surgery at St. Francis Hospital. He was placed under anesthesia by Dr. Vabnick. At that time, Dr. Vabnick was a partner in the medical group, East Memphis Anesthesia Services ("EMAS"). She was the only anaesthesiologist assigned or scheduled for Alexander's surgery that day.

On the day of the surgery, Dr. Jeffrey Williams was an employee physician of EMAS and was assigned as the "board man" for EMAS. As such, he was responsible for keeping track of the flow of the surgery cases and the personnel available to staff the cases, to assign anaesthesiologists to the operating rooms, and to supervise the nurse anesthetists; he was not assigned to an operating room. Dr. Williams is now a partner of EMAS. On the day of the surgery, both Dr. Ariaf Kathawala and Dr. Anant Shaw were partners in EMAS.

In trying to get an I.V. started in Alexander prior to the beginning of the surgery, Dr. Vabnick received assistance from Dr. Kathawala. After placing Alexander under a general anaesthesia, Dr. Vabnick then attempted to place a central venous access line into Alexander's right internal jugular vein but had difficulty in doing so. Dr. Fernando Herrera, Alexander's treating cardiothoracic surgeon, upon noticing the difficulty Dr. Vabnick was having, left the operating room, located Dr. Williams, and requested assistance for Dr. Vabnick.

According to Dr. Vabnick's motions, Dr. Kathawala provided assistance to Dr. Vabnick regarding withdrawal of Alexander's central line prior to surgery and both Dr. Kathawala and Dr. Shaw provided assistance to Dr. Vabnick after the "code" began. Dr. Vabnick alleges, however, that Dr. Williams did not assist in the care and treatment of Alexander, no person has testified that Dr. Williams was involved in any way in the care and treatment of Alexander, and the medical records do not reflect that Dr. Williams was involved in the care and treatment of Alexander.

Wade initially filed a lawsuit on November 10, 2003, against Dr. Vabnick in the Circuit Court of Shelby County, Tennessee, for the Thirtieth Judicial District at Memphis, the Honorable Circuit Court Judge James Russell presiding ("the state court action"). Wade sought to introduce into evidence in the state court action her husband's death certificate signed by Dr. Herrera, Dr. Herrera's postoperative report, and the video deposition testimony of Dr. Herrera. On April 1, 2009, Judge Russell ruled that the death certificate and postoperative report were inadmissible and that the video testimony would be severely edited. Immediately after that ruling, Wade requested, and was granted, a voluntary nonsuit without prejudice.[1]

Wade then filed the instant action in federal court on April 30, 2009. Based upon the same claim and against the same defendant as the state court action. In her initial disclosures filed in the federal court action on December 15, 2009, Wade identified Dr. Williams as a person having relevant knowledge concerning the events

---

**1.** Judge Russell also granted Dr. Vabnick's motion for a limited protective order which allowed Domico Kyle, LLC, to represent Dr. Kathawala in the state court action, including representing her at her March 17, 2009 deposition, finding that such representation violates no confidence between the physician and patient.

at St. Francis Hospital in November 2002. In addition, Wade's attorneys have verbally requested that Dr. Shah be produced for deposition on April 6, 2010.

In the present motion, Dr. Vabnick seeks a limited protective order allowing her attorneys, Domico Kyle, LLC, to represent Dr. Williams and Dr. Shah during deposition or at trial should they be called to testify and throughout the course of this litigation. Domico Kyle has previously represented Dr. Williams, other physicians at EMAS, and the group itself. Domico Kyle anticipates that it will represent Dr. Williams, Dr. Shah, other physicians at EMAS, and the group itself in future litigation. Dr. Vabnick represents to the court that the insurer of EMAS and Drs. Williams and Shah has already engaged Domico Kyle to represent Drs. Williams and Shah in their depositions.

Wade objects to Domico Kyle's representation of Dr. Williams and Dr. Shah on the grounds that Tennessee law prohibits defense counsel from communicating *ex parte* with the plaintiff's non-party, treating physicians because of the implied covenant of physician-patient confidentiality set forth in *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 631–35 (Tenn.2008); *Alsip v. Johnson City Med. Ctr.*, 197 S.W.3d 722, 725–30 (Tenn.2006); and *Givens v. Mullikin*, 75 S.W.3d 383, 407–09 (Tenn.2002). Wade argues the present motions are based on the assumption that Dr. Williams was not Alexander's treating physician but that until he is deposed, his exact role is unclear. Wade also notes that the defendants brought these motions, not Dr. Shah or Dr. Williams in their own interest, and that the court should deny the motions in an abundance

of caution. Wade insists that Dr. Vabnick should be limited to the use of formal discovery procedures to discover information from both Dr. Williams and Dr. Shah.

Dr. Vabnick contends that *Overstreet, Alsip,* and *Givens* are not applicable here because they only bar *ex parte* communications between opposing counsel and non-party, treating physicians who communicated with the patient. Dr. Vabnick argues that Dr. Williams was not a treating physician and that neither Dr. Shah nor Dr. Williams had any confidential communications with Wade. Dr. Vabnick contends that the rule established in *Givens* and *Alsip* does not apply because the covenant of confidentiality is premised on a contract created by payment of the patient to the physician and no such contract existed here because Alexander was never billed by EMAS or any physician for anesthesia services. Finally, Dr. Vabnick contends that the holding in *Overstreet* is limited to Worker's Compensation matters and is therefore inapplicable to this case, a medical malpractice action.

## II. ANALYSIS

### A. *Choice of Law*

■ Because this case is in federal court, the threshold question the court must resolve to decide this motion is whether the court should apply federal or state law.[2] Jurisdiction in this case is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.[3] In a conflict-of-laws analysis in a diversity case, a federal court applies the choice-of-law rules or conflict rules of the forum state, in this case, Tennessee. *Cole v. Mileti,* 133 F.3d 433, 437

---

2. Neither party has addressed the conflict of law issue in their respective brief. Both merely assume that Tennessee law is applicable.

3. Wade is a resident citizen of Missouri, (Compl. ¶ 1), and Dr. Vabnick is a resident citizen of Tennessee, (Compl. ¶ 2).

(6th Cir.1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). In tort actions, Tennessee adheres to the "most significant relationship" analysis for conflict-of-law questions. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn.1992). Here, the defendant is a Tennessee resident and the alleged tortious acts occurred in Tennessee. (Compl. ¶ 3.) Accordingly, the court must apply the substantive law of the state of Tennessee except in matters governed by the Federal Constitution or by acts of Congress. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)

 (holding that a federal court exercising jurisdiction over state-law claims must apply state laws when deciding those claims unless those state laws are superceded by the United States Constitution or

an act of Congress); 28 U.S.C. § 1652 (2006).[4]

**B. HIPAA and Preemption of State Law**

In 1996, Congress passed the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. 1320d *et seq.* ("HIPAA"), which governs the dissemination of protected health information. HIPAA became effective on April 14, 2003. "[Through] HIPAA, Congress has spoken about the protection that must be extended to patients regarding their health related information."[5] *EEOC v. Boston Market Corp.*, No. CV 03–4227, 2004 WL 3327264, at *2, 2004 U.S. Dist. LEXIS 27338, at *7 (E.D.N.Y. Dec. 16, 2004). Thus, the court must first look to HIPAA to determine if it controls *ex parte* communications with non-party physicians in this case.[6] The collective research of the par-

---

4. Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). As the Supreme Court observed in *Gasperini*, "classification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor." *Id.*

5. Health information is defined under HIPAA as:

any information, whether oral or recorded in any form or medium, that—
 (A) is created by a health care provider, health plan, public health authority, employer, life insurer, school or university or health care clearinghouse; and
 (B) relates to the past, present or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual.
42 U.S.C. § 1320d(4); *see also* 45 C.F.R. 160.103.

6. Choice of law in this case is not governed by Rule 501 of the Federal Rules of Evidence because no evidentiary privilege is involved.

Rule 501, found in Article V: Privileges provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority ... privilege ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision ... privilege ... shall be determined in accordance with State law.
FED.R.EVID. 501. Neither HIPAA nor the Tennessee Patients' Privacy Protection Act creates an evidentiary physician patient privilege. *See Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 926 (7th Cir.2004) ("We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege."); *and Overstreet*, 256 S.W.3d at 634 n. 3 ("The ... [Tennessee Code] ... does not include a testimonial physician-patient privilege. The term 'privilege' is a specific and well-defined term in the legal community.... Had our legislature intended to enact a privilege, the General Assembly, being versed in the legal lexicon,

ties and the court has revealed that this is a case of first impression in the Western District of Tennessee.

■ Under the Supremacy Clause of the United States Constitution, the laws of the United States "shall be the supreme law of the Land; ... and Thing in the Constitution or laws of any state to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. The Supremacy Clause results in federal preemption of state law if: (1) Congress expressly preempts state law; (2) Congress has completely supplanted state law in that field; (3) adherence to both federal and state law is impossible; or (4) the state law impedes the achievements of the objectives of Congress. *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604–05, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). Although Congressional intent is commonly the starting point for federal preemption analysis, *Ingersoll–Rand v. McClendon*, 498 U.S. 133, 137–38, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the existence of an express preemption provision in a statute nullifies the need for further analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

HIPAA expressly provides for its interaction with conflicting state laws concerning patient privacy. *Crenshaw v. MONY Life Ins. Co.*, 318 F.Supp.2d 1015, 1028 (S.D.Cal.2004). The general rule, as reflected by the regulations, is that HIPAA preempts any "contrary" state law. 45 C.F.R. § 160.203. The regulations define a "state law" to "mean a constitution, statute, regulation, rule, common law, or other State action having the force and effect of law." 45 C.F.R. § 160.202. State laws are contrary to HIPAA if: (1) it would be impossible for the health care provider to comply simultaneously with HIPAA and the state directive; or (2) the state provision stands as an obstacle to the accomplishment of the full objectives of HIPAA. 45 C.F.R. § 160.202(1), (2).

But, HIPAA does not preempt a state law which is "more stringent" than the provisions of HIPAA or its regulations. *Nw. Mem'l Hosp.*, 362 F.3d at 926 (citing 45 C.F.R. § 160.203(b)); *Law v. Zuckerman*, 307 F.Supp.2d 705, 709 (D.Md.2004); *Congress v. Tillman*, No. 09–10419, 2009 WL 1738511, at *1–2, 2009 U.S. Dist. LEXIS 50501, at *3 (E.D.Mich. June 16, 2009); *Stewart v. La. Clinic*, No. Civ. A. 99–1767, 2002 WL 31819130, at *3, 2002 U.S. Dist. LEXIS 24062, at *9 (E.D.La. Dec. 12, 2002). To meet the "more stringent" requirement, a state law must "provide greater protection for the individual who is the subject of the individually identifiable health information" than the standard set forth by HIPAA and its regulations. 45 C.F.R. § 160.202(6). In other words, courts will consider the state law more stringent than the Secretary's regulations if the state law "prohibits or restricts a use or disclosure in circumstances upon which such use or disclosure," HIPAA would otherwise permit. *Id.* § 160.202.

■ Congress expressly provided that HIPAA preempts state medical privacy laws except when those laws prove more stringent than the standards promulgated by the Secretary under his express author-

---

likely would have used the precise term 'privilege.' "). Nor have the courts of either jurisdiction seen fit to fashion such a privilege at common law. *See Nw. Mem'l Hosp.*, 362 F.3d at 926–27 (citing *Univ. of Pa. v. EEOC*, 493 U.S. 182, 188–89, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (other citations omitted)); *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir.1992); *United States v. Perryman*, 14 Fed. Appx. 328, 329 (6th Cir.2001); *see also Overstreet, supra*, 256 S.W.3d at 634 n. 3. Thus, although Rule 501 governs the law of privilege in federal courts, it is not applicable here as there are no privileges at issue in this case.

ity. 42 U.S.C. § 1320d–2 Note, (c)(2), 110 Stat.1936, 2033–2034. This language operates as both a "preemption" and an "anti-preemption" clause which works to "maintain the status quo in states in which more stringent privacy regulations existed prior to HIPAA." *Nat'l Abortion Fed'n v. Ashcroft*, No. 03 Civ.8695, 2004 WL 555701, at *5, 2004 U.S. Dist. LEXIS 4530, at *16 (S.D.N.Y. Mar. 18, 2004). Thus, a state law which is "more stringent" than HIPAA is left to "operate in its sphere of influence, unaffected by the federal statute." *Id.*, at *4, 2004 U.S. Dist. LEXIS 4530, at *13. In order to determine whether Tennessee state law provides the plaintiff in this case with more protection than HIPAA against defense counsel's *ex parte* access to plaintiff's treating physicians, the court must first examine how such communications are treated under each scheme.

### 1. *Ex Parte Communications under HIPAA*

HIPAA embodies Congress' recognition of "the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems." *South Carolina Med. Assoc. v. Thompson*, 327 F.3d 346, 348 (4th Cir. 2003); *Boston Market*, 2004 WL 3327264, at *3, 2004 U.S. Dist. LEXIS, 27338, at *8 ("HIPAA is a 'complex piece of legislation that addresses the exchange of health-related information.'" (quoting *Nat'l Abortion Fed'n*, 2004 WL 555701, at *2, 2004 U.S. Dist. LEXIS 4530, at *5–6)). "Congress enacted HIPAA, in part, to protect the security and privacy of [health information]." *Zuckerman*, 307 F.Supp.2d at 710. In order to accomplish its task, Congress delegated to the Secretary of Health and Human Services broad authority to promulgate rules and regulations protecting the privacy of patient health information. *Nw. Mem'l Hosp.*, 362 F.3d at 924 (citing 42 U.S.C. § 1320–2(d)). The regu-

lations place strict limitations on the ability of certain health care providers to release a patient's medical records or discuss the patient's medical history without the express consent of the patient. *Zuckerman*, 307 F.Supp.2d at 710–11.

The regulations provide certain exceptions to the general rule against disclosure of patient health information without the patient's prior written consent. *See Bayne v. Provost*, 359 F.Supp.2d 234, 236 n. 4 (N.D.N.Y.2005) (citing 45 C.F.R. § 164.512(a)). One such exception pertains to the disclosures made in connections with judicial and administrative proceedings. 45 C.F.R. § 164.512(a). Health care providers may disclose protected health information in connection with judicial and administrative proceedings according to the following guidelines:

(1) Permitted disclosures. A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:

(i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or

(ii) In response to a subpoena, *discovery request*, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if

(A) The covered entity receives satisfactory assurance ... from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been *given notice* of the request; or

(B) The covered entity receives satisfactory assurance ... from the party seeking the information that

reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

45 C.F.R. § 164.512(e)(1) (emphasis added). The Secretary defines "satisfactory assurance" as "a written statement and accompanying documentation" which demonstrates that:

(A) the party requesting such information has made a good faith attempt to provide written notice to the individual (or, if the individual's location is unknown, to mail a notice to the individual's last known address);

(B) The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court ...; and

(C) The time for the individual to raise objections to the court ... has elapsed, and:

(1) No objections were filed; or

(2) All objections filed by the individual have been resolved by the court ... and the disclosures being sought are consistent with such resolution.

45 C.F.R. § 164.512(e)(1)(iii). A proper protective order must both prohibit the parties from using or disclosing the patient's health information for any purpose not related to the judicial proceeding in which its production was ordered and require that the parties return or destroy the disclosed information (as well as all copies made thereof) at the end of the proceedings. 45 C.F.R. § 164.512(e)(1)(v).

■ Stated more plainly, the HIPAA regulations allow health care providers to disclose patient health information in connection with judicial proceedings: (1) in response to an order of the court, but only to the extent allowed by the language of the order; or (2) in response to a subpoena or formal discovery request where the requesting party assures the provider that either the patient was made aware of the request but did not object or the requesting party has made reasonable efforts to secure a proper protective order. *See Zuckerman*, 307 F.Supp.2d at 711; *Boston Market*, 2004 WL 3327264, at *4, 2004 U.S. Dist. LEXIS 27338, at *15; *Nat'l Abortion Fed'n*, 2004 WL 555701, at *2, 2004 U.S. Dist. LEXIS 4530, at *7; 45 C.F.R. § 164.512(e)(1)(i), (ii).[7]

■ Courts have differed as to whether HIPAA allows for *ex parte* communications between counsel and health care providers. *Compare Bayne*, 359 F.Supp.2d at 236 n. 4 ("We may reasonably infer that if a qualified protective order ... was in place then an *ex parte* discussion with the health provider would be appropriate."); *Congress*, 2009 WL 1738511, at *2, 2009 U.S. Dist. LEXIS 50501, at *4 ("[D]efendants may conduct an *ex parte* oral interview with [plaintiff's] physician if a qualified protective order ... is first put in place." (quoting *Holman v. Rasak*, 281 Mich.App. 507, 761 N.W.2d 391, 395 (2008))); *Palazzolo v. Mann*, No. 09–10043, 2009 WL 728527, at *3, 2009 U.S. Dist. LEXIS 22348, at *8 (E.D.Mich. Mar. 19, 2009) ("Defendants may conduct *ex parte* interviews with plaintiff's treating physicians consistent with HIPAA."); *Weiss v. Astellas Pharma, US, Inc.*, No 05–527JMH, 2007 WL 2137782, at *5, 2007

---

7. The regulations are permissive in nature, and do not compel the health care provider to disclose the patient's health information without written consent. *See* 45 C.F.R. § 164.512(e)(1) ("[A] covered entity *may* disclose protected health information ....") (emphasis added).

U.S. Dist. LEXIS 53453, at *15 (E.D.Ky. July 23, 2007) ("Private interviews permit investigation and preparation of possible defense theories without revealing potential work product."); *Croskey v. BMW of N. Am.*, No. 02–73747, 2005 WL 4704767, at *5, 2005 U.S. Dist. LEXIS 43442, at *13 (E.D.Mich. Nov. 14, 2005) ("A qualified protective [order] requires neither specific notice to Plaintiff's counsel nor Plaintiff's consent before Defendant may interview Plaintiff's treating physician *ex parte*."); *with Crenshaw*, 318 F.Supp.2d at 1029 (S.D.Cal.2004) ("HIPAA does not authorize *ex parte* contacts with healthcare providers."); *Zuckerman*, 307 F.Supp.2d at 710 ("Counsel should now be far more cautious in their contacts with medical fact witnesses to ensure that they do not run afoul of HIPAA's regulatory scheme."); *Boston Market*, 2004 WL 3327264, at *6, 2004 U.S. Dist. LEXIS 27338, at *20–21 ("The strong policy underlying HIPAA would appear to trump the reasoning of those pre-HIPAA decisions that allowed defense counsel ex parte access to plaintiff's treating physicians....").

Federal courts refusing to grant defense counsel *ex parte* access to plaintiff's health care providers have generally relied on the lack of specific authorization of such communications as well as HIPAA's underlying policy goal of protecting patient privacy as the basis for their rulings. In *Zuckerman*, the Maryland district court found that *ex parte* communications between defendant's counsel and the plaintiff's treating physicians violated HIPAA's privacy protections. 307 F.Supp.2d at 711. The court noted that although HIPAA does not prohibit all *ex parte* contact between attorneys and health care providers, "HIPAA clearly regulates the methods by which a physician may release a patient's health information, including 'oral' medical records." *Id.* at 708. The court went on to explain that HIPAA "radically changed the landscape of how litigators can conduct informal discovery in cases involving medical treatment." *Id.* at 711. The court opined that HIPAA now limited practitioners obtaining protected health information to those methods set forth in the regulations instead of the informal communications that were commonplace before its rules took effect. *Id.*

In *Boston Market*, the EEOC asserted claims on behalf of the plaintiff pursuant to Tile VII and the Americans with Disabilities Act against the defendant employer. 2004 WL 3327264, at *1, 2004 U.S. Dist. LEXIS 27338, at *2. When the defendant sought to engage in *ex parte* communications with two of the plaintiff's psychologists, the EEOC objected, citing HIPAA and the New York psychologist-patient privilege. *Id.*, at *2, 2004 U.S. Dist. LEXIS 27338, at *5. Because all of the plaintiff's claims were based on federal law, the court for the Eastern District of New York relied solely on HIPAA and its regulations in making its decisions. *Id.*, at *2, 2004 U.S. Dist. LEXIS 27338, at *6–7. After noting the regulations neither expressly approve of, nor prohibit, *ex parte* communications with health care providers, *id.*, at *4–5, 2004 U.S. Dist. LEXIS 27338, at *16, the court refused to enter an order requiring the plaintiff to execute releases allowing defendant's counsel *ex parte* access to plaintiff's psychologists, *id.*, at *6, 2004 U.S. Dist. LEXIS 27338, at *20. The court did, however, approve of a different protective order allowing defense counsel to conduct discovery of the plaintiff's health care providers "pursuant to the methods set forth in HIPAA," but the court was clear that defense counsel's methods were not to include *ex parte* interviews. *Id.*

Courts allowing *ex parte* communications have emphasized that HIPAA provides for qualified protective orders to

eliminate misuse of plaintiff's protected health information. In *Croskey v. BMW of North America*, the defendant objected to a magistrate judge's order that required the defendant to notify plaintiff's counsel of the defendant's desire to communicate *ex parte* with the plaintiff's treating physician. *Id.*, 2005 WL 4704767, at *1, 2005 U.S. Dist. LEXIS 43442, at *1. The district court for the Eastern District of Michigan found the magistrate judge's order had exceeded HIPAA's requirements regarding communication with health care providers. *Id.*, at *4, 2005 U.S. Dist. LEXIS 43442, at *10. The district court reasoned that under a proper reading of 45 C.F.R. § 164.512(e)(1)(ii)(A) and (B), notice to counsel would be superfluous. *Id.* The court explained that the Secretary's use of the word "or" between the two provisions evidences an intent that they operate as alternatives. Therefore, the court reasoned that because subsection (ii)(A) required notice to the plaintiff and subsection (ii)(B) did not, HIPAA was designed to allow defendant's counsel to communicate freely with the plaintiff's treating physicians so long as defendant's counsel had secured a proper protective order. *Id.*, at *4, 4–5, 2005 U.S. Dist. LEXIS 43442, at *10, 13.

In *Bayne v. Provost*, the district court for the Northern District of New York determined that *ex parte* communications would be appropriate where a qualified protective order was in place, consistent with the instructions of 45 C.F.R. §§ 164.512(e)(1)(ii)(B), (v)(A) and (B). 359 F.Supp.2d at 241. The court reached this conclusion despite relying on two other published cases in which the *ex parte* discussions were found to be prohibited by HIPAA. *Id.*, at 240. First, the court pointed out that in the *Zuckerman* case, the district court had prohibited *ex parte* discussions only " 'in the absence of strict compliance with HIPAA.' " *Bayne*, 359 F.Supp.2d at 240 (quoting *Zuckerman*, 307

F.Supp.2d at 707). Second, the court explained that the Southern District of California in *Crenshaw* had assumed that HIPAA permits a health care provider to disclose protected health information when the provider " 'receives satisfactory assurance from the party seeking information that reasonable efforts have been made by such party to secure a qualified protective order.' " *Bayne*, 359 F.Supp.2d at 240 (quoting *Crenshaw*, 318 F.Supp.2d at 1029). The *Bayne* court was careful to note that *ex parte* interviews did not go unchecked under HIPAA. *Id.* at 241–42. Rather, the court explained that the regulations provided the necessary mechanical framework to which defense counsel must adhere to obtain *ex parte* access to plaintiff's treating physicians. *Id.*, at 242 n. 7 ("Under this scheme, in the first instance, it is the qualified protective order which may lend itself to *ex parte* interviews, not conversely.")

The court notes HIPAA's "strong policy" against allowing defense counsel *ex parte* access to plaintiff's treating physicians. *Boston Market*, 2004 WL 3327264, at *4 n. 5, 2004 U.S. Dist. LEXIS 27338, at *15 n. 5 (citing *Zuckerman*, 307 F.Supp.2d at 711). The court, however, finds that the exceptions to HIPAA's privacy rules allow defense counsel to conduct *ex parte* interviews with plaintiff's treating physicians after first securing, or attempting to secure, a qualified protective order consistent with the regulations. *Bayne*, 359 F.Supp.2d at 242; *Croskey*, 2005 WL 4704767, at *4, 2005 U.S. Dist. LEXIS 43442, at *10–11; 45 C.F.R. §§ 164.512(e)(1)(iv) & (v).

### 2. *Ex Parte Communications under Tennessee Law*

■ Conversely, Tennessee law strictly prohibits defense counsel from making use of any informal discovery

methods to obtain medical information from a physician without a plaintiff's express consent. *Alsip*, 197 S.W.3d at 727. In Tennessee, health care providers and health care facilities are expressly required by statute to keep a patient's medical records and identifying health information confidential. *Givens*, 75 S.W.3d at 407 (citing TENN.CODE ANN. §§ 63–2–101(b)(1) (2004 & Supp.2008); 68–11–1502, 1503 (2006)). In addition, the Tennessee Supreme Court held in *Givens* that "an implied covenant of confidentiality" arises in every transaction between a patient and physician. *Overstreet*, 256 S.W.3d at 634. The covenant of confidentiality is both an implied-in-fact and an implied-in-law contract. *Id.*, at 632. Therefore, it may either be based on evidence sufficient to show offer acceptance and intent to affect legal relations or it may arise from obligations established under law. *Id.*

 A physician breaches the implied covenant of confidentiality by releasing a patient's medical information, "without the patient's consent, through informal conversations with others." *Id.* at 631 (citing *Givens*, 75 S.W.3d at 409). But, the covenant of confidentiality does not bar a defendant from accessing the plaintiff's health information completely. *See Alsip*, 197 S.W.3d at 727. In fact, the covenant does not in any way lessen the amount of relevant health information which defense counsel may obtain through discovery. *Id.* Rather, the covenant denies the defendant *ex parte* access to plaintiff's treating physicians in favor of the formal discovery methods available to all litigants, including depositions upon oral examination or written questions, written interrogatories, and requests for admission. *Id.*

 Unlike evidentiary privileges in most states, the plaintiff in Tennessee does not waive the covenant of confidentiality by placing his or her medical condition at issue in a lawsuit. *Id.* at 728.

Instead, the commencement of the action effectuates the plaintiff's implied consent to produce such medical information pursuant to the formal methods under the Rules of Civil Procedure. *Id.* at 728–29 & n. 4. Though public policy voids the covenant of confidentiality for the purposes of discovery, *see Harper v. Brinke*, No. 3:06–CV412, 2007 WL 2782307, at *1, 2007 U.S. Dist. LEXIS 70267, at *2 (E.D.Tenn. Sept. 21, 2007), the covenant remains as a bar to informal conversations with health professionals. According to the Tennessee Supreme Court:

> A prohibition against *ex parte* contacts regulates only how defense counsel may obtain information from a plaintiff's treating physicians, i.e., it affects the defense counsel's methods, not the substance of what is discoverable.

*Alsip*, 197 S.W.3d at 727 (internal quotations omitted). The Tennessee Supreme Court has therefore prohibited informal discovery to prevent the unneeded and inadvertent disclosure of irrelevant medical information, which might serve to compromise the integrity of the physician-patient relationship. *Id.* at 729–30.

### 3. *Tennessee Law Not Preempted*

 It is therefore clear that Tennessee law is more stringent than HIPAA's privacy rules concerning *ex parte* communications with health care providers. Absent a plaintiff's express consent, Tennessee law prohibits informal communications with the plaintiff's treating physician to obtain health information. On the contrary, HIPAA only bars such communications prior to the entry of a qualified protective order. After the requisite protective order is entered, whether by consent or over the plaintiff's objection, defendant is free to utilize informal discovery, including specifically *ex parte* interviews, under HIPAA.

Accordingly, because the laws of Tennessee are more stringent than HIPAA concerning defense counsel's ability to make use of informal discovery methods, HIPAA does not preempt Tennessee's ban on *ex parte* communications with a plaintiff's non-party treating physician. *Nw. Mem'l Hosp.,* 362 F.3d at 925 (finding that states with more stringent medical privacy laws were free to enforce those provisions "in suits in federal court (mainly diversity suits) . . . in which state laws supplies the rule of decision").

## C. *Ex Parte Conversations with Nonparty Physicians in the Same Partnership under Tennessee Law*

Having determined that Tennessee law as set forth by the Tennessee Supreme Court barring *ex parte* communications with non-party treating physicians controls, the court must now determine the parameters of the prohibition as they apply to this case. Specifically, this court must decide whether the decisions of the Tennessee Supreme Court bar *ex parte* conversations of defense counsel with a non-party physician when the non-party physician is not a treating physician or when the non-party physician is an employee, partner, or member of the same medical group as the defendant doctor. Likewise, the court must also determine whether the prohibition prevents communications with a treating physician who had no communications with the patient. *Overstreet, Alsip,* and *Givens* did not directly address these issues. Nor has the Tennessee Supreme Court addressed the issue in any other decisions this court could locate. In the absence of any clear authority on point, it is the role of the federal court in diversity cases to consider all of the available legal sources in order to formulate a rule of decision. *See Anderson Dev. Co. v. Travelers Indem. Co.,* 49 F.3d 1128, 1131 (6th Cir.1995) ("[A] federal court deciding a diversity case under state law must apply the law of the state's highest court. If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from 'all relevant data.' . . . A federal court may in this situation also consider decisions from other jurisdictions.").

The court first notes that the covenant of confidentiality is not limited to information communicated by the patient to the physician. As the trilogy of Tennessee Supreme Court cases makes clear, the covenant applies to all health information possessed by the physician concerning the patient regardless of how it was obtained. *Overstreet,* 256 S.W.3d at 634 (noting that "the doctor warrants that any confidential information gained through the relationship will not be released without the patient's permission" (quoting *Givens,* 75 S.W.3d at 407)). Therefore, Dr. Shah, whom both parties agree had no communications with Alexander, may still possess protected health information about the deceased which Tennessee's covenant of confidentiality would protect.

A state court of appeals in Florida dealt with a similar issue in *Estate of Stephens ex rel. Clark v. Galen Health Care, Inc.,* 911 So.2d 277 (Fla.Dist.Ct.App.2005). In that case, a decedent's estate brought a medical negligence claim and a wrongful death action against the parent company of the hospital at which the decedent died and the companies which employed the physicians that had treated the decedent while at the hospital. *Id.,* at 279. The estate did not name any of the physicians as defendants. *Id.* The trial court granted the defense counsel's request to communicate *ex parte* with the plaintiff's treating physicians. *Id.,* at 281–82. The plaintiff estate filed a petition for writ of certiorari.

Although the court of appeals quashed the order as overly broad because it ap-

plied to "all" treating physicians, the court of appeals nevertheless upheld the right of the defendant hospital to communicate *ex parte* with its agents, employees, and former employees when it was faced with potential liability for the negligent care and treatment of a patient. The court of appeals reasoned that, in this context— i.e., when a hospital corporation discusses information obtained in the course of employment with its employees—the communications were not "disclosures" as contemplated by Florida's statutory patient privilege which prevents the disclosure of patients' health information because corporations could only act through their employees. *Id.*, at 282. The court of appeals further recognized that the [defendants'] attorneys "should also be able to speak with the [defendants'] employees and agents as the corporate entities are able to function only through them." *Id.* The court of appeals used the example of an attorney sharing a client's information with his secretary or paralegal concerning a client's case, in which the court pointed out that all of the agents learning the client's information are bound by the same duty of confidentiality as the attorney. *Id.* As an example, the court pointed out that communications by an attorney to the attorney's agents of privileged information would not break the attorney-client privilege but that communications to non-agents would. *Id.* The court analogized that, in the physician-patient situation, communications to agents are not disclosures but merely the sharing of information, whereas communications to non-agent, third parties would be disclosures. *Id.*

 The court agrees with the Florida court of appeals that communications between employees and agents of a corporation are not disclosures for the purposes of health information privacy laws. The decision of the Florida court of appeals to allow *ex parte* communications rested primarily on the fact that the nonparty treating physicians were all members or employees of a defendant practice group. The court of appeals noted that "a corporation[ ] can function only through its employees and agents, and its "knowledge" of information like how its standards for nurse training and patient care are being carried out depends solely on information acquired and reported by its agents and employees." *Id.*, at 281. Tennessee courts have tacitly recognized this principle in other contexts. *See Trau–Med of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 703 (Tenn.2002) ("A basic principle of agency is that a corporation can act only through the acts of its corporate directors, officers, and other employees and agents."); *Haverty Furniture Co. v. Foust,* 174 Tenn. 203, 212, 124 S.W.2d 694, 698 (1939). The same applies to partners in partnerships. *First Tenn. Prod. Credit Assoc. v. Davis,* 748 S.W.2d 83, 84–85 (Tenn.1988) (citing Tenn.Code Ann. § 61–1–108(a)).

In this case, however, the partnership is not a named defendant, the time for adding defendants has passed, and it appears that the statute of limitations has expired. Were the partnership a named defendant, the court would certainly allow the partnership's attorneys to communicate *ex parte* with non-party, treating physicians who were employees or members of the partnership. Because, however, Dr. Vabnick is the only named defendant, the court cannot justify such communications on those grounds.

 The court disagrees with Dr. Vabnick's argument that *Overstreet* is limited specifically to the worker's compensation context. The court finds that the Tennessee Supreme Court extended the covenant of confidentiality in *Overstreet* to physician-patient relationships in all contexts as an implied-in-law contract. While that

case centered around a worker's compensation claim, the court finds that the principals underlying the court's decision are applicable in all contexts. Thus, the covenant of confidentiality attaches to all physician-patient relationships regardless of the nature of their payment arrangements. Had the Tennessee Supreme Court intended to limit its decision to the worker's compensation context, it could have done so expressly. Seeing no such limitation, the court will not insert its own restriction at the expense of a plaintiff's right to protect his or her personal health information.

 The court does find, however, that the implied covenant of confidentiality does not apply to Dr. Williams because Dr. Williams did not render medical treatment to Alexander as required to trigger the covenant of confidentiality. While other courts have attempted to define what qualifies a doctor as a "treating physician" by looking to the level of patient care provided, *see Crenshaw*, 318 F.Supp.2d at 1021–24, this court's inquiry is comparatively simple as the covenant of confidentiality arises upon the physician's rendering of any treatment to the patient, *Alsip*, 197 S.W.3d at 726; TENN.CODE ANN. § 68–11–1502. Conversely, the covenant does not apply to a physician who has not rendered any treatment merely because the physician was on duty at the time of the incident. Because the covenant of confidentiality is based on the physician's acquisition of information concerning the patient's medical condition through treatment, its existence requires more than a doctor's temporal proximity to the occurrence and professional relationship with the doctors providing care.

Here, Wade has failed to show that Dr. Williams ever rendered medical care to Alexander. Instead, Wade seeks to prevent defense counsel from speaking with Dr. Williams based on the mere possibility that he somehow obtained the Alexander's sensitive medical information. It appears to the court from the briefs of the parties that Dr. Williams is merely a fact witness to the events that occurred on the day of surgery. Therefore, the court finds Wade's contentions meritless and that they do not prevent counsel for defendant from communicating *ex parte* with Dr. Williams concerning the events of this case.

 In addition, the court does not read *Givens* to block Domico Kyle from representing Dr. Shah despite the fact that he qualifies as a treating physician. Tennessee courts look unfavorably upon any act which diminishes the freedom of the individual to choose a lawyer. *See Arena v. Schulman, LeRoy & Bennett, P.C.*, 233 S.W.3d 809, 812 (Tenn.Ct.App.2006) (citing Tenn. Sup.Ct. R. 8, R. Prof. Conduct 5.6, cmt. 1). Any contractual agreement, rule, or policy which, either directly or indirectly, prevents a client from obtaining representation from the attorney of his or her choosing is void against public policy as an impermissible restriction on the practice of law. *Arena*, 233 S.W.3d at 812–13 (citing *Spiegel v. Thomas, Mann, & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn.1991)).

In the context of this case, Tennessee's policy on legal representation stands in conflict with its policy against *ex parte* discussions with a treating physician, as the physician who chooses to be represented by defendant's counsel would necessarily engage in *ex parte* communications with said counsel. Balancing the two competing policies, the court finds that the prohibition against *ex parte* communications must yield to the doctor's right to choose an attorney. To do otherwise would likely elevate the form of discovery of the decedent's medical information over Dr. Shah's right to representation of his choice. For these reasons, the court holds that the implied covenant of confidentiality between

a physician and patient in Tennessee does not prohibit Domico Kyle from representing Drs. William and Shah in this action.

The court notes, however, that its recognition of Dr. Shah's right to choose his attorney in no way relieves Domico Kyle of its ethical obligation to avoid potential conflicts of interest in its representation of multiple doctors in this action. Having not been made aware of any wrongdoing on the part of Domico Kyle and having no reason to suspect any at this time, the court simply reminds Domico Kyle of its ethical obligations to its clients and to the court.

### III. CONCLUSION

For the foregoing reasons, the court grants the Dr. Vabnick's motion for a protective order to allow her counsel to represent Drs. Williams and Shah in this litigation, specifically in anticipation of and at their upcoming depositions provided that no ethical conflict of interest arises between Domico Kyle and their clients.