No. B061780. Second Dist., Div. Six. Dec. 15, 1993.

CASSANDRA PROVINCE, a Minor, etc., Plaintiff and Appellant, v. CENTER FOR WOMEN'S HEALTH AND FAMILY BIRTH, Defendant and Respondent.

CASSANDRA PROVINCE, a Minor, etc., Plaintiff and Appellant, v. TAD CALLAHAN, Defendant and Respondent.

1674

**COUNSEL**

James M. Duenow and Kathlene Bonnigson for Plaintiff and Appellant.

Bonne, Bridges, Mueller, O'Keefe & Nichols and Peter G. Bertling for Defendant and Respondent.

## Opinion

**STONE (S. J.), P. J.**—Pamela Province, as guardian ad litem for Cassandra Province, appeals from the judgment after jury verdict in favor of respondents Doctor Tad Callahan and the Center for Women's Health and Family Birth (Center).[1] Because of prejudicial juror misconduct and because of the improper, prejudicial admission of expert witness testimony, we reverse.

### Facts

Pamela contends Center committed medical malpractice while she was in labor with Cassandra. After Doctor Callahan induced labor, Pamela complained to attending Nurse Kathy McConnell that she felt something "like a heartbeat in my vagina," and that it was "pulsating." Pamela thought something might be wrong and asked Nurse McConnell to get Doctor Callahan. Nurse McConnell had never heard anyone describe such a sensation. She checked the fetal heartbeat and found it to be normal. She did not report Pamela's unusual complaint to Doctor Callahan because, in her clinical judgment, it was not significant.

Nurse McConnell went to get Doctor Callahan because labor had intensified. Before examining Pamela again, Doctor Callahan permitted her to use the restroom. When she stood up in the restroom after urinating, she noticed that the umbilical cord protruded from her vagina. Pamela had been in the bathroom at least a couple of minutes. Doctor Callahan immediately placed her in bed, lifted Cassandra's head to keep it off the prolapsed cord, administered oxygen and sent her from Center to a hospital in an emergency transfer.

Cassandra suffered severe brain damage. As a result, she is confined to a wheelchair, cannot control her bodily movements or functions and she cannot communicate. She is, however, of normal intelligence.

This matter has been tried twice. In the first trial, the trial court declared a mistrial because the jury was unable to reach a decision on the issue of negligence. This time, on a special verdict of nine to three, the jury found Center not negligent.

The trial court denied Pamela's motion for new trial and this appeal ensued. (Code of Civ. Proc., § 657.)

---

[1] The parties have stipulated to voluntary dismissal of Doctor Callahan with prejudice. Center is the only remaining respondent.

## DISCUSSION

### *Juror Misconduct*

Evidence Code section 1150, subdivision (a), sets forth the type of evidence admissible in affidavits concerning juror misconduct. It states, ". . . any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Evidence Code section 1150, subdivision (a), draws a " 'distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning process of the individual juror . . . .' " (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 413 [185 Cal.Rptr. 654, 650 P.2d 1171].) Section 1150 limits impeachment evidence to " 'proof of overt conduct, conditions, events, and statements. . . . those open to sight, hearing, and the other senses and thus subject to corroboration.' " (32 Cal.3d at p. 413; *In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260].)

Here, juror declarations establish that Juror Donald Frith committed misconduct. Juror James Darrah declared that during a ride home during the fourth day of trial, Frith stated "something like, 'I think this is ridiculous; this is a waste of time and the decision is clear cut.' He then started talking about an article he had read in the newspaper about this trial and the first trial of this action and a million dollar lawsuit. The Judge had told us not to discuss the case or to read stories about the case and I told Mr. Frith that I did not want to know what he discovered in reading the article." This conversation occurred before plaintiff had finished presenting her case-in-chief.

Juror Darrah further declared that "In the jury room during deliberations Mr. Frith also started talking about the newspaper article he had read and the Foreman said, 'No one has read any articles out of the newspaper and neither have you. Do you understand?' " Frith told the jury he wanted them to vote immediately, before considering the evidence, which they did.

Four other jurors declared they heard Frith ask some of the jurors whether they had "read the newspaper article about this case?" Juror Frith admitted in

his declaration he asked the other jurors whether they had read the article about the case, although other jurors stated they had not seen it.

■ "It is well settled that it is misconduct for a juror to read newspaper accounts of a case on which he is sitting . . . . [Citations.] '. . . [A]nd if the newspaper contains any matter in connection with the subject-matter of the trial which would be at all likely to influence jurors . . . the act would constitute ground for a motion for a new trial. . . .'" (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327].)

■ It is well established that "'. . . a presumption of prejudice arises from any juror misconduct. . . . However, the presumption may be rebutted by proof that no prejudice actually resulted.' [Citation.]" (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 416.) In reviewing the denial of a motion for new trial based on jury misconduct, this presumption "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.]" (*Id.* at p. 417; see also fn. 10, citing Cal. Const. art. VI, § 13, which calls for this court to review the whole record; *Glage* v. *Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 321 [276 Cal.Rptr. 430].)

"'When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced . . . we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial.'" (*People* v. *Holloway, supra,* 50 Cal.3d 1098, 1110; *Glage* v. *Hawes Firearms Co., supra,* 226 Cal.App.3d at pp. 321-322.) Although a strict rule of reversal does not apply to civil cases, the rationale of the substantial likeliness test equally applies to civil and criminal cases because civil litigants are just as entitled to a fair trial. (*Id.* at p. 322.) The right to a trial by a jury of 12 unbiased and unprejudiced jurors is jurisdictional. (*Deward* v. *Clough* (1966) 245 Cal.App.2d 439, 444 [54 Cal.Rptr. 68].)

"Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 417.)

■ There is no doubt juror misconduct occurred here. Moreover, that misconduct is serious. "For a juror to prejudge the case is serious misconduct. [Citations.]" (*Clemens* v. *Regents of University of California* (1971) 20

Cal.App.3d 356, 361 [97 Cal.Rptr. 589].) The declarations indicate that Juror Frith made up his mind to vote for the defense before plaintiff had the opportunity to complete her case-in-chief.

Even if we were to assume that Frith convinced no other juror to find for defendant, his conduct is prejudicial because the final tally was nine to three. As the California Supreme Court has noted, where ". . . the verdict was nine to three, the disqualification for bias of any one of the majority jurors could have resulted in a different verdict." (*Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132], wherein the Supreme Court found sufficient evidence to uphold grant of new trial.)

In the instant case, there is an additional reason to hold this misconduct is prejudicial—in the previous trial on this matter a mistrial resulted due to a hung jury.

Our independent review of the record also reveals there is considerable evidence upon which reasonable jurors could have found Center to have been negligent. Expert witnesses testified that a nurse must immediately report any strange or unusual signs or symptoms to the attending physician that the nurse does not understand, such as the complaint Pamela presented here. There is evidence here that Nurse McConnell failed to conform to this standard of care. Had she followed the standard of care, it is possible that Doctor Callahan would have been able to prevent brain damage to Cassandra.

The record reveals that Nurse McConnell destroyed her original notes and recreated the chart regarding Pamela's labor the day after it occurred. She did so to look after her best interests. The supervising nurse found it extremely unusual for Nurse McConnell's own notes to be destroyed.

Some expert witnesses for both plaintiff and defendant acknowledged that the fetal monitoring strips for Cassandra's heart taken at Center showed some variable decelerations of her heart which could indicate possible oxygenation problems to Cassandra before Pamela went to the bathroom.

Many of the expert witnesses on both sides also stated it is probable that brain damage to Cassandra occurred between the time of Pamela's complaint about feeling a heartbeat in her vagina and the time she emerged from the bathroom. This probably occurred because it is likely that Cassandra's head would have rested against the prolapsed cord during those few minutes.

These experts came to the conclusion that the damage did not occur as the result of an older knot in the cord. They came to this conclusion because

Cassandra was pink in color, generally maintained a sound heartbeat, resuscitated quickly and was not profoundly acidic at birth. These facts are at odds with there having been a tight knot in the umbilical cord preceding its prolapsing.

### Testifying of Dr. Karanjawala

On the date Cassandra was born, pathologist Doctor Eruch Karanjawala examined the placenta and umbilical cord and he prepared a pathology report. Respondent failed to name him on its expert witness list and he has never been deposed.

At the first trial, Cassandra's counsel objected to presentation of any expert testimony by Doctor Karanjawala because respondent failed to name him as an expert witness. Respondent's counsel incorrectly stated during the second trial that Doctor Karanjawala had been designated as a treating physician. The trial court denied respondent's motions to augment its expert witness list, and we denied a petition for writ of mandate to compel augmentation.

Cassandra's counsel made an *in limine* motion that the testimony of an anesthesiologist and Doctor Karanjawala "be limited to what they saw as percipient witnesses, neither of them having been designated either as retained or non-retained experts and therefore I think clearly under [Code of Civil Procedure section] 2034, can't give opinion testimony. . . ."

Respondent's counsel urged the trial court to permit them to elicit testimony from Doctor Karanjawala to reiterate the opinions he gave at the first trial. Defense counsel incorrectly stated that Cassandra's counsel had not objected to such opinion testimony during the first trial. The trial court, without the assistance of a transcript of the first trial, could not recall what had transpired at the first trial on this point. The trial ruled it would permit Doctor Karanjawala only "to testify as to his impressions at the time of his examination of the cord."

Cassandra's counsel tried to obtain a standing objection to expert witness testimony from Doctor Karanjawala. The trial court stated that "if he gets to the point where I think his testimony is to be considered expert testimony . . . why then you can make your motion to be permitted to call your own pathologist."

Code of Civil Procedure section 2034 states, in pertinent part, that ". . . any party may obtain discovery by demanding that all parties simultaneously

exchange information concerning each other's expert trial witnesses . . ." including "a list containing the name and address of any . . . person . . . whose oral or deposition testimony in the form of an expert opinion any party expects to offer in evidence at the trial."

Code of Civil Procedure section 2034, subdivision (a)(2) continues, "If any expert designated by a party . . . has been retained . . . for the purpose of forming and expressing an opinion in anticipation of the litigation or in preparation for the trial of the action, the designation of that witness shall include or be accompanied by an expert witness declaration . . . ."

That declaration "shall contain [among other things]:

". . . . . . . . . . . . . . . . . . . . . . . . . .

"(B) A brief narrative statement of the general substance of the testimony that the expert is expected to give.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(D) A representation that the expert will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the specific testimony, including any opinion and its basis, that the expert is expected to give at trial."

Respondent's counsel failed to comply with Code of Civil Procedure section 2034, and respondent did not obtain leave to augment or otherwise to call Doctor Karanjawala as an expert witness at either trial. Under section 2034, subdivision (j) the appropriate sanction for such failure, "on objection of any party who has made a complete and timely compliance" is that "the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to do any of the following:

"(1) List that witness as an expert under subdivision (f).

"(2) Submit an expert witness declaration.

"(3) Produce reports and writings of expert witnesses . . . .

"(4) Make that expert available for a deposition under subdivision (i)."

Although the trial court ostensibly applied section 2034, subdivision (j) by an earlier admonition to limit testimony to "impressions," respondent's

counsel successfully obtained expanded opinion testimony from Doctor Karanjawala, over specific objections, in violation of the Civil Discovery Act of 1986. (Code Civ. Proc., § 2016 et seq.)

Respondent's counsel elicited expert testimony from Doctor Karanjawala, despite the previous ruling of the trial court. The trial court permitted Doctor Karanjawala to testify as to his opinion on the crucial question as to when the knot in the cord occurred and whether it limited circulation to the fetus "in his judgment." The trial court overruled Cassandra's counsel's specific objection to this question. Defense counsel then was permitted to ask Doctor Karanjawala about the significance of the congestion. The court did not strictly limit his testimony to that of a percipient witness.

During this testimony, Cassandra's counsel repeatedly objected to these questions which called for expert opinion. The trial court refused to allow a continuing, standing objection and overruled the objections made to such testimony.

Furthermore, unlike the first trial, Doctor Karanjawala testified that the lengthy umbilical cord had formed a tight, true knot obstructing the flow of blood and that this knot may have formed days before the baby was due. He testified that the pooling of blood by this obstruction would take anywhere between one and eighteen hours. Juror declarations suggest that some jurors may have been swayed by such testimony.

■ As the Court of Appeal recently explained in the case of *Martinez* v. *City of Poway* (1993) 12 Cal.App.4th 425, 428 [15 Cal.Rptr.2d 644], ". . . the exchange of information about expert witnesses is a critical event in the course of any civil litigation and well-defined procedures are needed to ensure fairness to the parties and efficient resolution of disputes. 'Modern litigation relies increasingly on expert testimony. To prepare for trial, each side needs to know which expert will testify for the other side and what they will have to say. . . .' "

■ Here, unlike *Martinez*, disclosure pursuant to these statutes was not merely defective, it was nonexistent, save for a very belated attempt generally to augment which was properly denied. (Cf. *Martinez* v. *City of Poway*, *supra*, 12 Cal.App.4th at p. 432.)

■ Very recently, the Court of Appeal in *Beverly Hospital* v. *Superior Court* (1993) 19 Cal.App.4th 1289, 1294 [24 Cal.Rptr.2d 238], elucidated the purposes of California's discovery statutes as "among other things, to assist the parties and the trier of fact in ascertaining the truth; to encourage

settlement by educating the parties as to the strengths of their claims and defenses; to expedite and facilitate preparation and trial; to prevent delay; and to safeguard against surprise." (Citing our Supreme Court in *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266].)

■ If we were to accept counsel's argument that Doctor Karanjawala's improper testimony at the first trial, for which timely objection was made, absolves respondent of further compliance with the Civil Discovery Act, it would eviscerate the purposes of this carefully crafted statutory scheme. "[A] change of testimony by a witness has been held to be sufficient to grant a new trial on the basis of surprise *when the attorney has interviewed the witness to determine the testimony expected on the point in question. . . .*" (Italics added.) (*Dickison* v. *Howen* (1990) 220 Cal.App.3d 1471, 1478 [270 Cal.Rptr. 188], citing cases.) Here, Cassandra's counsel has not yet been provided the opportunity to depose Doctor Karanjawala. Without the opportunity to depose an expert witness, that person's testimony may truly be a surprise.

The Discovery Act of 1986 requires full and timely disclosure regarding experts; it has teeth in the form of exclusion and monetary sanctions to ensure compliance for its salutary purposes. On retrial, respondent's counsel must fully comply with the Discovery Act, including permitting Doctor Karanjawala to be deposed. The trial court must limit his testimony to percipient observations if respondent fails to do so. We note that upon this reversal and remittitur, the time clock for the "initial trial date" under the Discovery Act is reset. (*Beverly Hospital* v. *Superior Court, supra,* 19 Cal.App.4th 1289.)

### *Ex parte Communication Between Counsel and Dr. Karanjawala*

■ Cassandra contends that defense counsel improperly made ex parte contact with Doctor Karanjawala in violation of the formal discovery process. She argues that regardless of whether she may have waived the physician-patient privilege by tendering her medical condition in this suit, such ex parte communication violates statutory process. We agree. (*Torres* v. *Superior Court* (1990) 221 Cal.App.3d 181, 188 [270 Cal.Rptr. 401]; Evid. Code, §§ 994, 996.)

In *Torres,* a doctor had reviewed a medical study regarding plaintiff's heart condition and had prepared a letter report on it six years before litigation ensued. The physician never met the patient. The trial court ruled that the doctor was not a treating physician and could be called as an expert

witness. He had been designated as an expert witness, pursuant to statute. The record did not disclose any intent to probe any privileged areas of the doctor's proposed testimony.

The physician-patient privilege protects confidential communications transmitted in the course of a physician-patient relationship. (Evid. Code, § 992; *Torres* v. *Superior Court, supra*, 221 Cal.App.3d at p. 185.) "Once the patient waives his right to confidentiality by putting [her] physical condition in issue by filing suit, any disclosure pertinent to the issues in litigation within the scope of section 996 is permitted." (*Ibid.*) In *Torres*, as in the instant case, Cassandra generally waived the privilege by tendering the very matter at issue.

In *Torres*, the Court of Appeal held that the question of waiver of the privilege was not ripe as to current treatment, however. (*Torres* v. *Superior Court, supra*, 221 Cal.App.3d at p. 185. fn. 2.) The Court of Appeal indicated that further discovery was contemplated.

To "ensure no violation of his statutory privilege occurs in an ex parte interview" the Court of Appeal then held that ". . . discovery should be limited to the statutorily mandated manner." (221 Cal.App.3d at p. 188.)

Here, although we know the claim Cassandra makes we do not know what further evidence might be proffered by Doctor Karanjawala. Such information awaits discovery. Although Doctor Karanjawala's expression of his opinions concerning Cassandra's condition to date do not appear to violate the physician-patient privilege, the admonition by the Court of Appeal in *Torres* for counsel to avoid ex parte communications with physicians before discovery is completed should be heeded by counsel here.

There may also be ethical considerations regarding whether Doctor Karanjawala should testify against Cassandra's interests, but these concerns are not evidentiary ones. (See *Torres* v. *Superior Court, supra*, 221 Cal.App.3d at pp. 186-188.) As in *Torres*, "[w]e are persuaded the better rule is to permit [Karanjawala] to testify for the defense" as to his expert opinion *provided the defense timely and properly designates its intention to call him as an expert witness and provides Cassandra the opportunity to thoroughly depose him.* "[T]he need for truth outweighs any claimed privacy interest resulting from the [pathology study] . . . ." (*Id.* at p. 187.)

*Cassandra's Presence in the Courtroom During Trial*

█ Respondent successfully moved to exclude Cassandra from being present in the courtroom during the liability phase of trial. Appellant opines

that Cassandra has an absolute right to appear at trial as a matter of due process and because of her right to jury trial. Not so.

Although "It seldom happens that a trial can be properly had in the absence of the plaintiff [because] some matter of vital importance is liable to be overlooked . . . *until the trial calls it to the recollection of the plaintiff* . . ." the rule is not absolute. (*Jaffe* v. *Lilienthal* (1894) 101 Cal. 175, 177 [35 P. 636], italics added.)

There are circumstances, such as those in the instant case, where the trial judge may exercise discretion to exclude the plaintiff from the courtroom. The primary circumstance in which trial courts may do so is when the plaintiff is unable to assist counsel in the liability phase of a bifurcated trial. This is such a case.

In *Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 896, footnote 27 [112 Cal.Rptr. 540, 519 P.2d 588], our Supreme Court held "entirely without merit" the contention that it is error to limit to 10 minutes the trial appearance of a substantially paralyzed 17-year-old who could barely communicate. And, in *Whitfield*, trial was not bifurcated.

Even criminal defendants "[do] not have an absolute right to be present at all stages of . . . trial . . . ." (*Helminski* v. *Ayerst Lab., A Div. of A.H.P.C.* (6th Cir. 1985) 766 F.2d 208, 213, fn. 4, citing the United States Supreme Court in *Faretta* v. *California* (1975) 422 U.S. 806, 819, fn. 15 [45 L.Ed.2d 562, 572, 95 S.Ct. 2525].) A criminal defendant "possesses a Fifth Amendment right to be present in court 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge,' *i.e.*, only to the extent that his absence would deprive him of a fair trial. [Citation.]" (*Helminski* v. *Ayerst Lab., A Div. of A.H.P.C., supra,* 766 F.2d at p. 213, fn. 4, (*Helminski*) italics original.)

Similarly, the due process clause of the Fifth Amendment does not grant a civil litigant the absolute right to be present personally during the trial of his case. (Citing *Faucher* v. *Lopez* (9th Cir. 1969) 411 F.2d 992, 996.)

The due process right to be present during trial "may be sufficiently protected in the party's absence so long as the litigant is represented by counsel. [Citation.]" (*Helminski, supra,* 766 F.2d at p. 213.)

In *Helminski*, the Sixth Circuit Federal Court of Appeals surveyed, considered and discussed the rules which had been applied to a broad range of cases. Here, we are concerned only with a plaintiff who is both physically disfigured and who is unable to aid counsel in the proceedings.

Where a plaintiff is disfigured and she is unable to assist counsel ". . . the trial court can exclude the plaintiff or limit [her] presence. . . ." (*Helminski, supra*, 766 F.2d at p. 217.) The trial court is in the best position to gauge whether a particular plaintiff should or should not be allowed to be present at trial. Here, the trial court did not err in excluding a very young, disfigured plaintiff who could not assist counsel in the liability phase of her case. (See *Dickson* v. *Bober* (1964) 269 Minn. 334 [130 N.W.2d 526, 530], "determination of whether a plaintiff unable by reason of his injuries to contribute to or understand the trial proceedings should be permitted . . . to attend the trial must rest in the sound discretion of the trial court . . ."; accord, *Morley* v. *Superior Court of Arizona, etc.* (1981) 131 Ariz. 85 [638 P.2d 1331, 27 A.L.R.4th 575]; accord, *Purvis* v. *Inter-County Telephone & Telegraph Co.* (Fla.Dist.Ct.App. 1967) 203 So.2d 508, 511; accord, *Talcott* v. *Holl* (Fla.Dist.Ct.App. 1969) 224 So.2d 420, 421-422.)

As the court in *Morley, supra*, points out, "A plaintiff unable to at least communicate with counsel will have no right denied by exclusion from the courtroom during the liability phase of the trial. If in addition the plaintiff's physical condition, allegedly caused by the defendant, is so pitiable that the trial court determines the plaintiff's mere presence would prejudice the jury, then failure to exclude the plaintiff during the liability phase would deny the defendant's right to an unbiased jury . . . ." (*Morley* v. *Superior Court of Arizona, etc., supra*, 638 P.2d at p. 1334.)

The trial court properly exercised its discretion to exclude Cassandra from the courtroom during the liability phase of trial.

The judgment is reversed because there was prejudicial juror misconduct and because the trial court improperly allowed Doctor Karanjawala to testify to expert opinions in this case. Costs to Pamela.

Gilbert, J., and Yegan, J., concurred.

The petition of respondent Center for Women's Health and Family Birth for review by the Supreme Court was denied March 3, 1994.