Filed 1/28/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MULTIVERSAL ENTERPRISES-MAMMOTH PROPERTIES, LLC,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>YELP, INC.,<br><br>  Defendant and Respondent. | B305193<br><br>(Los Angeles County<br>Super. Ct. No. BC484055) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Affirmed.

Ervin Cohen & Jessup, Robert M. Waxman and David N. Tarlow for Plaintiff and Appellant.

Davis Wright Tremaine, Thomas R. Burke, Nicolas A. Jampol, Diana Palacios; and Aaron Schur for Defendant and Respondent.

_____

Yelp, Inc. (Yelp) operates a popular online Web site that contains customer reviews of businesses. As part of the operation, Yelp uses software designed to filter out unreliable or biased reviews. (Hereafter "filter" or "recommendation software.") Multiversal Enterprises-Mammoth Properties (Multiversal), which operates restaurants in Mammoth Lakes, sued Yelp for an injunction under the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.) and the false advertising law (FAL; Bus. & Prof. Code, § 17500 et seq.) to prevent Yelp from touting the accuracy and efficacy of its filter. During a bench trial, the court excluded Multiversal's principal, James Demetriades, from a portion of the trial and denied Multiversal's motion to compel access to Yelp's source code. Multiversal contends these rulings were in error. We affirm.

## BACKGROUND

We take the pertinent preliminary facts from our prior opinion in this matter, *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294.

### A. Yelp's Web site

Yelp operates a free social media Web site and search engine that is available to the public and has no registration requirement. Users who do register may post reviews about local businesses on the site using a five-star rating system. Yelp's Web site draws tens of millions of people each month who search for and review the public ratings of businesses. Yelp sells advertising on its site to generate revenue.

Yelp constantly battles the problem of unreliable reviews, which generally are paid reviews, negative reviews written by business competitors, or biased reviews written by friends, employees or relatives of the business being reviewed. Yelp

developed filtering software with the aim of identifying reviews likely to be unreliable. It started using the filter in 2005 and employs a team of engineers to monitor and improve it.

The Yelp filter applies uniform rules to all reviews and does not favor advertisers over nonadvertisers. Yelp does not use filtered reviews in calculating a business's rating, and they do not appear on the main page, but are viewable on a special "filtered review page." Business owners can freely post responses to reviews they receive and can contact reviewers privately to engage in further dialogue. To promote the filter's integrity, Yelp businesses cannot delete, change, or reorder ratings or reviews. Yelp admits that its filter is not foolproof, and expressly tells users that "the filter sometimes affects perfectly legitimate reviews and misses some fake ones, too. After all, legitimate reviews sometimes look questionable, and questionable reviews sometimes look legitimate."

According to Yelp, in addition to relying on the filter, a site user can judge how much weight to give to any particular review by reading the reviewer's profile and reviews, and by assessing statistics regarding those reviews.

Yelp invested tens of millions of dollars and hundreds of thousands of hours in developing and maintaining the filter, which runs on hundreds of computers.

Yelp's filter is proprietary software that is not distributed or sold to third parties because disclosure would expose Yelp to the risk of persons using the information to overcome the filter. Yelp does not provide the source code or the algorithms to business owners or the general public.

In 2010, Yelp created a cartoon video to educate and contribute to the ongoing public dialog about the integrity of online reviews.

On November 13, 2013, Yelp replaced the 2010 video on its Web site with a new video which, among many other changes, used Yelp's updated terminology by, for example, referring to the filter as "recommendation software."

## B. Demetriades and Multiversal

As previously noted, Demetriades is the principal of Multiversal Enterprises-Mammoth Properties, LLC, which owns businesses in Mammoth, California, including the restaurant "Rafters." Multiversal purchased a marketing package on Yelp's Web site.

Multiversal's restaurants received several critical reviews on Yelp, and the recommendation software removed several positive reviews. On August 24, 2011, Multiversal's attorney wrote to Yelp and asserted that "Yelp's review filter has [improperly] filtered forty reviews out of Rafters' Yelp profile."

Before becoming a restaurant owner, Demetriades was a software developer who, in his words, founded "the largest integration software company in the world with a couple hundred million, about the size of Yelp, couple hundred million in revenue." He has also owned or participated in other software companies, and has "access to hundreds of developers."

Demetriades took an interest in Yelp's recommendation software, explaining that, "since I'm a programmer and have the largest software integration company in pretty much the world with thousands of employees, I'm very familiar with the area of software development. And I was very concerned with what I was seeing[.]" During an interview on ABC News in 2018,

4

Demetriades demanded that Yelp override the operation of its recommendation software and display reviews he deemed to be "real and legitimate."

In April 2012, Demetriades's counsel demanded access to "the source code and algorithm for the so-called filters," and demanded that Yelp change the results for Demetriades's restaurant. Yelp rejected these demands.

## C.   Complaint

In May 2012, Demetriades filed this action in his personal capacity, asserting causes of action for false advertising and unfair competition. Multiversal substituted in as plaintiff after the prior appeal. Multiversal alleged that Yelp engaged in false advertising by making five statements (the "Challenged Statements"):

1.   "Yelp uses the filter to give consumers **the most trusted reviews**."

2.   "All reviews that live on people's profile pages go through a remarkable filtering process that takes the reviews **that are the most trustworthy and from the most established sources** and displays them on the business page. This keeps less **trustworthy reviews out** so that when it comes time to make a decision you can make that using information and insights that are actually helpful."

3.   "Rest assured that our engineers are working to make sure that whatever is up there is the most **unbiased and accurate information you will be able to find** about local businesses."

4.   "Yelp is always working to do as good a job as possible on a very complicated task—**only showing the most trustworthy and useful content out there**."

5. "Yelp has an automated filter that suppresses a small portion of reviews—it targets those suspicious ones you see on other sites." (Original boldface.)

Yelp made the first four of the Challenged Statements in the 2010 video, and the fifth on its Web site.

Multiversal alleged the statements were untrue: Yelp did not use the filter to give consumers the most trusted reviews, and the filter neither accurately separated the most trustworthy reviews from unreliable reviews nor posted reviews from trusted sources. Instead, Yelp's automated filter suppressed more than only a small portion of reviews; allowed posts of the "most entertaining" reviews to be shown on the unfiltered portion of the Web site, regardless of the source; allowed posts of reviews to be shown on the unfiltered portion of a local business page regardless of whether the source was trustworthy or unbiased; and suppressed a substantial portion of reviews that were unbiased and trustworthy. Multiversal further alleged that Yelp's Web site contained reviews from persons who were biased against the businesses they reviewed.

## D.    Trial

Pretrial discovery revealed that Demetriades was dissatisfied with Yelp reviews of his restaurants and exhorted a Multiversal director to "hire the people" who could write positive reviews. At least one restaurant employee and one manager submitted a review in violation of Yelp's terms of service. Specifically, in opposition to a motion to compel, Ian MacBean, Yelp's Director of User Operations, declared Yelp's records reflected that Jack Carter, a Rafters manager, submitted six 5-star reviews of Rafters within the space of three hours, five of them under five assumed names.

6

Before trial, the court denied Multiversal's motion to compel production of Yelp's source code and granted Yelp's motion to exclude Demetriades from portions of the trial where the source code would be discussed. We discuss these proceedings later in the opinion.

At a bench trial, Dr. David Stewart testified as a consumer survey expert for Multiversal. Dr. Stewart testified he conducted a survey that found the Challenged Statements were misleading or deceptive because Yelp's recommendation software (1) failed to examine the content of reviews on its Web site; (2) had no capability to examine the content of reviews on its Web site; (3) failed to determine whether a review on its Web site was accurate enough to be deemed "most trustworthy"; (4) failed to determine whether a reviewer was honest before deeming a reviewer an "established source."

After trial concluded and additional briefing was submitted, the court issued a statement of decision in which it analyzed each Challenged Statement and found that neither Multiversal's survey nor any other evidence established that any statement was false or misleading.

On the contrary, the court found that "Yelp's evidence established its filter determines which reviews can be categorized as 'most trusted.'" The court found "the evidence did not establish that the unfiltered reviews Yelp posted on the business pages came from less trustworthy reviews or from less established sources," and Yelp presented "substantial evidence of the efforts made by Yelp employees, including engineers, to ensure that real people with established profiles are writing the top reviews, and that business owners and employees are not writing their own biased or inaccurate reviews of their businesses

7

or the businesses of their competitors." The court found that "suppression of 25% of all of the reviews was a small portion of the millions of reviews affected by Yelp's filter."

The court concluded that "the Challenged Statements did not violate the UCL or the FAC," and "there was no evidence that Yelp acted 'with the intent directly or indirectly . . . to make or disseminate . . . before the public in this state . . . any advertising device . . . which [was] known, or which by exercise of reasonable care should [have been] known, to be untrue or misleading.' "

Accordingly, the court entered judgment for Yelp.

Multiversal appeals.

## DISCUSSION

### A.    Motion to Compel

Multiversal contends the judgment should be reversed because the trial court erred in denying its motion to compel production of the source code.[1]  We disagree.

#### 1.    Relevant Proceedings

In 2010, the Office of the Attorney General of the State of New York (NYAG) investigated Yelp's recommendation software to determine whether it favored advertisers, which would be contrary to Yelp's public statements that Yelp tried to display the most trustworthy and unbiased reviews.

Yelp's filter software was also investigated by the Federal Trade Commission to ensure that in its statements to the public Yelp accurately described the filter's operation.

---

[1] The parties do not dispute that Yelp's source code constitutes a trade secret within the meaning of Civil Code section 3426.1.

8

Yelp prepared two presentations in response to those investigations, which it provided to Multiversal in discovery. These presentations described the components, factors, and rules used by the recommendation software.

On May 15, 2016, Multiversal moved to compel production of the source code for Yelp's recommendation software. The trial court denied the motion without prejudice, finding that Yelp had made a "sufficient case that the information provided thus far, plus appropriate depositions, may be all that is reasonable and necessary to determine whether the more specific statements made in the advertisement at issue are true."

In November 2016, Jim Blomo, who managed the engineering team responsible for Yelp's recommendation software, testified in deposition about the mechanics and operation of the software and the presentations made for the NYAG and Federal Trade Commission. Blomo testified that reviewing the source code would not be the best way to determine how the recommendation software evaluates data or whether it worked properly, and specifically would provide no information on whether the software "suppresses a small portion of reviews."

On January 30, 2017, Multiversal renewed its motion to compel production of Yelp's source code for the recommendation software.

The trial court held an evidentiary hearing on the matter over two days.

At the hearing, Dr. Julian J. Bunn, a computational scientist and Caltech professor, testified as Multiversal's expert. Dr. Bunn testified that access to Yelp's source code was necessary to test the recommendation software (1) to determine whether Yelp's review filter was designed to operate in a manner

9

consistent with Yelp's statements, (2) to determine whether the purported factors used to make filter determinations were actually present, and (3) to confirm or deny the truth or falsity of the Challenged Statements. He testified that to test the source code would require that Yelp set up a secure environment with a small piece of filtering code and about 100 reviews, and the entire process would cost approximately $10,000.

However, Dr. Bunn also testified that: The Challenged Statements contain subjective words that he would not know how to "program . . . into a computer"; a review of the source code would not tell him whether "Yelp's website did, in fact, provide users with the most trustworthy and reliable reviews in the relevant time period[,]"; he did not know if he could evaluate the veracity of the Challenged Statements based on the source code; review of the source code would not tell him whether Yelp's non-filter efforts affected "the trustworthiness and reliability of reviews on . . . Yelp's website"; and there was no generally accepted scientific metric to determine whether something was trustworthy.

Dr. Bunn also testified he had no reason to doubt the presentations Yelp provided to the NYAG or Federal Trade Commission.

Mr. Blomo, as Yelp's expert, testified it would be impossible to take a "snapshot" of Yelp's source code and related databases at any given time to test the recommendation software because of the "continuous processing that [was] going on some of these systems."

Blomo testified that to "recreate the setup that Yelp had at the time, . . . you would want the operating system that the software was running on and the libraries that are sometimes

10

outside of Yelp's control that the recommendation software used and you would want the data at the exact time that . . . software was running." It would therefore be impossible to recreate Yelp's recommendation software during the relevant period, or even to limit the testing to a particular time, as any proper test would be required to consider associated data, which could encompass almost all the reviews and associated data on Yelp's database at the time. Such testing would be impossible given the dynamic nature and the amount of data Yelp regularly analyzed during the relevant period, which likely consisted of "at least ten Libraries of Congress each week."

Blomo testified that other methods than looking at the source code were available to determine whether the recommendation software worked.

After additional briefing from both parties, the trial court found that "[w]hile Multiversal has established that the source information is relevant to the issues in the case, it has not shown that the source code is 'necessary to the proof of a . . . material element.' " The court explained that "Multiversal does not need the source code to establish whether Yelp's software considers [certain] information, because it already has a comprehensive list of the various factors that Yelp does consider." The court found that "potential harm . . . could come to Yelp if the source code information was accessible to others, even if produced under a protective order."

The court therefore denied Multiversal's motion to compel production of Yelp's source code.

Multiversal contends the court erred.

### 2. Applicable Law

The Civil Discovery Act provides litigants the right to broad discovery. (Code Civ. Proc., § 2017.010.)

However, a party seeking discovery of trade secret information, "must make a prima facie, particularized showing that the information sought is relevant and necessary . . . and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit. It is then up to the holder of the privilege to demonstrate any claimed disadvantages of a protective order. Either party may propose or oppose less intrusive alternatives to disclosure of the trade secret, but the burden is on upon the trade secret claimant to demonstrate that an alternative to disclosure will not be unduly burdensome to the opposing side and that it will maintain the same fair balance in the litigation that would have been achieved by disclosure." (*Bridgestone/Firestone, Inc. v. Superior Court* (1992) 7 Cal.App.4th 1384, 1393 (*Bridgestone*).)

In *Bridgestone*, the plaintiffs sought the confidential rubber formulas for tires alleged to be defective. (*Bridgestone, supra*, 7 Cal.App.4th at pp. 1388-1389.) The trial court ordered disclosure of the formulas, subject to a protective order, but the Court of Appeal vacated the order, holding that while the plaintiffs had "plainly establish[ed] that the trade secret formulas would be helpful to the analysis of the case," they had not demonstrated the necessity of the information to carry their burden of proof. (*Id.* at p. 1397.)

We review a discovery order for abuse of discretion. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1186.)

12

### 3. Discussion

Here, the Challenged Statements boiled down to two assertions: (1) Yelp's filter results in "trusted," "trustworthy," "unbiased," "accurate" and "useful" reviews from "established sources" (the "trustworthy" claim); and (2) the filter suppresses only a small portion of "suspicious" reviews (the "scope" claim).

Dr. Bunn, Multiversal's expert, testified that examination of Yelp's source code was necessary to determine (1) whether Yelp's review filter was designed to operate in a manner consistent with its statements, i.e., whether the purported factors used to make filter determinations were actually present, and (2) to confirm or deny the truth or falsity of the Challenged Statements.

Blomo testified that other methods than looking at the source code were available to determine whether the recommendation software worked. The trial court was entitled to credit this testimony over Dr. Bunn's assertion that he could confirm the truth or veracity of the Challenged Statements only by examining the source code. This is especially so because Dr. Bunn admitted that a review of the source code would not tell him whether Yelp's Web site did, in fact, provide trustworthy and reliable reviews because "trusted," "trustworthy," "unbiased," "accurate" and "useful" are subjective terms.

With respect to Yelp's second Challenged Statement, that its filter suppresses only a small portion of suspicious reviews, examination of the source code could conceivably reveal the scope of this suppression. But such an examination would have been ill suited to determine whether the reviews suppressed were "suspicious," a subjective concept (the flip-side of "trustworthy"),

13

and Blomo testified that the task was infeasible and other methods existed to evaluate the filter's performance.

Given the mediocre value of information available from a review of the source code, Blomo's testimony that review of the code was unnecessary, and the extensive information Yelp forwarded to Multiversal concerning its recommendation software (information it had already provided to the NYAG and Federal Trade Commission), the trial court was within its discretion to find that although Yelp's source code might be helpful in analyzing the Challenged Statements, it was not necessary.

Multiversal argues it needed access to Yelp's source code because Yelp maintained no statistical analysis data with which to make a historical analysis. However, Multiversal offers no explanation why this data is relevant or would have been used to establish the falsity of the Challenged Statements.

B.    **Exclusion of Demetriades During the Trade Secret Portion of the Trial**

Multiversal contends the judgment should be reversed because the trial court erred in excluding Demetriades from that portion of the trial where Yelp's source code was discussed. We disagree.

1.    **Relevant Proceedings**

On December 21, 2018, Yelp filed a motion to exclude Demetriades from that portion of the trial in which Yelp's trade secret information would be discussed, a motion Multiversal vigorously opposed.

After a hearing, the trial court found that "Demetriades is a software developer, and he was the CEO of 'the largest integration software company in the world with a couple of

hundred million, about the size of Yelp, couple hundred million in revenue,'" and that "Demetriades has also owned and been on the board of other software companies, 'with access to hundreds of developers.'" The trial court found it unlikely that Demetriades needed to be present at trial to assist Multiversal's counsel with technical issues, as he had not been present at the evidentiary hearing where those issues were discussed, and in any event Multiversal's expert would be allowed to attend the trade secret portion of trial to assist Multiversal's counsel with technical matters. The court acknowledged Yelp's concern that a protective order restricting Demetriades from disclosing Yelp's trade secret information would be nearly impossible to enforce because he could use the information to subvert Yelp's recommendation software without detection.

Accordingly, the court found "Yelp's interests in protecting its trade secret information outweighs Multiversal's interest in having Demetriades attend the trade secret portions of trial." The parties represented at oral argument that Bunn remained subject to a protective order entered during discovery.

The court granted Yelp's motion and ordered that Demetriades be excluded from the portion of trial where testimony of trade secret information was discussed. Mr. Demetriades was allowed to attend the rest of the trial. Multiversal was also entitled under the court's order to have a designated expert present during the trade secret portion of trial. (It ultimately chose not to have an expert present.)

### 2. Applicable Law

The Sixth Amendment to the federal Constitution, which pertains to criminal proceedings, "provides a number of rights that together have been construed as establishing a [party's]

15

right to be personally present" at a trial.[2] (*Arnett v. Office of Admin. Hearings* (1996) 49 Cal.App.4th 332, 338 (*Arnett*).) However, the right is not absolute. (*Ibid*.) With respect to civil proceedings, the federal and California Constitutions guarantee only due process of law. (*Ibid*.)

"Due process guarantees ' "notice and opportunity for hearing *appropriate to the nature of the case*." ' " " 'How that is to be achieved is to be determined by the exercise of discretion by the trial court.' " (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601 (*Jesusa V.*).)

Due process does not confer upon a civil party an absolute right to be physically present at trial. (See *Yarbrough v. Superior Court* (1985) 39 Cal.3d 197, 203-204.) On the contrary, a trial court has discretion to exclude a party from trial. (See *ibid*.; see also Code Civ. Proc., § 128, subd. (a)(3) [court bears inherent power to administer the courtroom to ensure orderly proceedings].)

In a civil matter, a party's right to be present at trial can be protected when the party is represented by counsel. (See, e.g., *Arnett*, *supra*, 49 Cal.App.4th at pp. 338-339; *Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 536 (*Morales*);

---

[2] The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." (U.S. Const., 6th Amend., pt. 1 of 17.)

16

*Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1686 (*Province*).)

To be sure, " '[i]t seldom happens that a trial can be properly had in the absence of the plaintiff [because] some matter of vital importance is liable to be overlooked . . . until the trial calls it to the recollection of the plaintiff . . .'[, but] the rule is not absolute." (*Province*, *supra*, 20 Cal.App.4th at p. 1686.) "The due process right to be present during trial 'may be sufficiently protected in the party's absence so long as the litigant is represented by counsel.' " (*Ibid.*) The decision to exclude a party from trial is left to the discretion of the trial court. (*Ibid.*)

"A ruling that constitutes an abuse of discretion" is one "that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

### 3.    Discussion

Here, Multiversal was represented by counsel and afforded the right to have its expert present during the portion of trial from which Demetriades was excluded, accommodations the Supreme Court has deemed sufficient in civil proceedings. (See *Jesusa V.*, *supra*, 32 Cal.4th at p. 601.) Through Multiversal's attorney and expert, Multiversal had the opportunity to call witnesses, to cross-examine adverse witnesses, and to make real-time assistance available to counsel. Nothing in the record suggests that any matter of importance was overlooked due to his absence.

Further, the record reflects that Demetriades has a background as a software developer and corporate executive, with access to software companies and "hundreds of developers." It further reflects that he actively made successful efforts to

undermine Yelp's review screening process by inducing employees to submit false reviews. The trial court could reasonably conclude that Demetriades would benefit from access to Yelp's trade secret information. We conclude that the court could reasonably have found that excluding Demetriades from a limited portion of the trial while safeguarding Multiversal's right to have other representatives present, measures similar to the protective order entered during discovery, gave Multiversal "notice and opportunity for hearing appropriate to the nature of the case." (*Jesusa V.*, *supra*, 32 Cal.4th at p. 601; see also Civ. Code, § 3426.5 [a trial court is authorized to "preserve the secrecy of an alleged trade secret by reasonable means"].) Due process required no more.

Moreover, Multiversal identifies no prejudice resulting from this exclusion. "[A] judgment may not be reversed on appeal unless, after an examination of the entire cause, including the evidence, it appears that the error caused a miscarriage of justice." (*Morales*, *supra*, 1 Cal.App.5th at p. 536.) Multiversal makes no attempt to show how any testimony at trial would have been different absent Demetriades's exclusion, nor how any error affected the outcome of the case. It claims only that Demetriades was in a position to provide "valuable assistance" in "navigating the technical testimony." But Multiversal, which declined to have Demetriades present at a prior evidentiary hearing where similar technical issues were discussed, had access to a technical expert, and nothing in the record suggests that its counsel and expert were incapable of addressing all issues raised without Demetriades's assistance.

Multiversal relies on *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178 (*NBC*) for the proposition

that "*before* substantive courtroom proceedings are closed or transcripts are ordered sealed, a trial court must hold a hearing and expressly find that (i) there exists an overriding interest supporting closure and/or sealing; (ii) there is a substantial probability that the interest will be prejudiced absent closure and/or sealing; (iii) the proposed closure and/or sealing is narrowly tailored to serve the overriding interest; and (iv) there is no less restrictive means of achieving the overriding interest." (*Id.* at pp. 1217-1218, fns. omitted.)

*NBC* is inapposite.  There, the court in a civil trial excluded the public and press from all courtroom proceedings held outside the presence of the jury.  (*NBC*, *supra*, 20 Cal.4th at p. 1181.) Here, no substantive courtroom proceedings were closed— Demetriades was merely excluded from them.  As discussed above, personal exclusion of a party from trial in a civil matter rests within the sound discretion of the trial court, so long as the party's right to be present is protected by representation by counsel.

Multiversal argues exclusion of Demetriades was an abuse of discretion because it was based on the trial court's implicit finding not that he would likely misappropriate Yelp's trade secret information, but that the information would inevitably be disclosed to third parties as a result of his normal work duties. As Multiversal observes, the doctrine of inevitable disclosure has been rejected in California as a basis for protecting trade secrets. (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1447.)

We reject Multiversal's premise—the trial court made no implicit finding that innocent disclosure of Yelp's trade secret information would be unavoidable were Demetriades to attend the portion of trial where that information was discussed.  On the

19

contrary, at the hearing on Yelp's exclusion motion the court expressly stated it "did not base [its ruling] on the inevitable disclosure doctrine." The court excluded Demetriades to protect against the risk of misappropriation of Yelp's trade secret presented by Demetriades's desire and ability to circumvent Yelp's recommendation software, not against inevitable innocent disclosure of trade secret information. (See *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 525 [distinguishing threatened misappropriation from inevitable innocent disclosure].)

Multiversal argues the exclusion order was fatally defective because it contained no findings supporting Demetriades's exclusion. This is so, Multiversal argues, because the court merely acknowledged Yelp's arguments—that Yelp's interest in protecting its trade secret information outweighed Multiversal's interest in attending portions of trial; that a protective order would inadequately protect its interests because it would be nearly impossible to enforce; and that Demetriades would use Yelp's trade secrets to evade its recommendation software without detection—but made no affirmative findings regarding them. We disagree. The court expressly found that the need for Demetriades to be present when technical issues were discussed was minimal given that he had not been present during an evidentiary hearing on those issues, and given that Multiversal's expert could be present. Although the court did not expressly find that a protective order in lieu of exclusion would be ineffective, it did so implicitly when it acknowledged Yelp's concern on this issue and found that "based" on Yelp's arguments, the balancing of interests favored exclusion. These

20

findings were specific enough to permit a reviewing court to determine whether the exclusion order was properly entered.

Multiversal argues the exclusion order was improper under Evidence Code section 777, which provides in pertinent part that although "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses," "[a] party to the action cannot be excluded under this section." (Evid. Code, § 777, subds. (a) & (b).) Multiversal reads section 777 as prohibiting the exclusion of a party, period. The argument is without merit. Evidence Code section 777 prohibits exclusion only of a party who could otherwise be excluded as a witness under that section. It does not prohibit exclusion of a party for other reasons.

Relying on *Payne v. Superior Court* (1976) 17 Cal.3d 908, 914, Multiversal argues that because Demetriades's constitutional right to access the courts is fundamental, any restriction on that access must be subjected to strict scrutiny, under which the exclusion order here fails. We disagree.

As discussed above, in civil matters the California and federal Constitutions guarantee a party only due process, which does not grant a party the right to appear personally in court in all circumstances. (See *Payne, supra,* 17 Cal.3d at p. 913 ["The right to defend [against a civil lawsuit] has been tempered by judicial determination that a prisoner has no right to appear personally in court to protect his property"].) The manner in which a court safeguards due process rights "is to be determined by the exercise of discretion by the trial court." (*Id.* at p. 927.)

In *Payne*, Torrey Wood Payne was convicted of receiving guard dogs that had been stolen from a business competitor. He was then sued civilly for damages arising from the theft of the

21

dogs.  (*Payne, supra*, 17 Cal.3d at p. 911.)  Because Payne was indigent, he could not afford an attorney.  Because he was incarcerated he could not be present at trial.

Holding that this "dual deprivation of appointed counsel and the right to personal presence in court" (*Payne, supra*, 17 Cal.3d at p. 923) amounted to an infringement of a fundamental right, an infringement that could be suffered only by a "limited category of Californians" (*id*. at p. 911), our Supreme Court applied a strict scrutiny test to determine whether the deprivation was valid.  (*Id*. at p. 914.)

*Payne* expressly stated its holding did *not* apply to simple exclusion of a party from a civil trial:  "What is at stake is neither the abstract right of a prisoner to appointed counsel nor his right to appear personally in court.  Instead, the issue is the propriety of depriving indigent prisoners of both those rights and thereby virtually denying their access to the courts." (*Payne, supra*, 17 Cal.3d at p. 913.)  *Payne* therefore affords Multiversal no assistance.  (See *Arnett, supra*, 49 Cal.App.4th at p. 339 [in *Payne*, the "California Supreme Court concluded that when an indigent prisoner facing a bona fide lawsuit is deprived of both personal attendance and representation by counsel, then he is essentially denied access to the courts"].)

## DISPOSITION

The judgment is affirmed.  Respondent is to recover its costs on appeal.

CERTIFIED FOR PUBLICATION


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


BENDIX, J.

23